THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEXANDER BROWN, Defendant-Appellant.

First District (3rd Division)   No. 1—04—0714

Opinion filed November 16, 2005.—Rehearing denied December 12, 2005.

Steven A. Greenberg and Scott D. Sherwin, both of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Peter D. Fischer, Kathryn Schierl, and Margaret J. Campos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARNEZIS delivered the opinion of the court:

Following a bench trial, the circuit court found defendant Alexander Brown guilty of armed violence, unlawful use of a weapon, aggravated unlawful use of a weapon and aggravated fleeing or attempting to elude and sentenced him to 15 years of incarceration. Defendant appeals, arguing that (1) the State failed to prove him guilty of the charges beyond a reasonable doubt and (2) his conviction for armed violence based on his commission of the felony of aggravated fleeing or attempting to elude violates the proportionate penalties clause of the Illinois Constitution. We affirm.

## BACKGROUND

The evidence shows that, at 1:20 a.m. on March 9, 2002, Chicago police officers Carlos Salazar and Sean Whelan were parked in their marked squad car on 90th Street at Mackinaw Avenue in Chicago when they heard gunshots. They saw the driver of a black Lexus stopped on Mackinaw fire three or four shots through the Lexus' passenger window at a group of people standing in front of the Blues Lounge at 91st Street and Mackinaw. The officers were parked a block away from the shooting and had an unobstructed view of the Lexus. Officer Salazar was driving the squad car and, with the squad car's lights off, immediately turned it onto Mackinaw in the direction of the Lexus. Officers Salazar and Whelan saw and heard two more shots as they approached, after which the Lexus sped northbound up Mackinaw.

When the officers slowed the squad car to check on the people at the lounge, a man lying on the ground rose and pointed after the Lexus. The officers then pursued the Lexus, engaging the squad car's siren and emergency lights. The Lexus was the only car on Mackinaw. Officer Salazar estimated that he was driving approximately 60 to 70

miles per hour and the Lexus' speed was approximately 70 to 80 miles per hour on Mackinaw, which has a posted speed limit of 35 miles per hour. He testified that a second squad car with its emergency lights on joined the chase at approximately 88th Street and Mackinaw.

Mackinaw ended at 87th Street and the gap between Officer Salazar's squad car and the Lexus was half a block. Officer Salazar followed the Lexus west onto 87th Street, both cars fishtailing in the turn due to their rate of speed. He then followed the Lexus north onto Burley Avenue. Officer Salazar estimated the Lexus' speed on Burley at 60 miles per hour. The Lexus was the only black car and the only Lexus on both 87th and Burley. Shortly after the turn onto Burley, the officers saw a silver object tossed from the passenger window of the Lexus. Officer Salazar estimated the distance between his squad car and the Lexus when the object was thrown as a quarter block while Officer Whelan estimated it at 100 to 150 feet. The officers both stated that the object was thrown from the Lexus approximately one block after the turn onto Burley.

Officer Salazar reported to his dispatcher that something, possibly a gun, had been ejected from the Lexus and continued to follow the Lexus until it stopped at 85th Street. Officers Salazar and Whelan removed the sole occupant, the driver, and identified him as defendant. Officer Salazar observed four or five spent .40-caliber shell casings in the Lexus, which an evidence technician subsequently recovered. A car with one male and several female occupants drove up. The man, Arthur Vaug n, yelled at defendant and pointed to him as the person who had shot at him in front of the lounge.

Officer Christopher Kapa heard a dispatch call about the shooting and pursuit. Driving eastbound on 87th in his marked squad car, he heard sirens and saw a black Lexus approaching on 87th with a squad car in pursuit. Both cars turned north onto Burley and Officer Kapa followed. Shortly after the turn onto Burley, Officer Kapa was approximately 35 feet behind the Lexus when he saw a silver object thrown from the passenger side of the Lexus onto the ground. "Less than a minute later," he pulled over and retrieved a chrome-colored .40-caliber semiautomatic weapon from the ground. The weapon was cocked and loaded with a round in the chamber. Officer Kapa then went to where he heard the Lexus was stopped and saw "civilians" pointing to defendant as the person who shot at them. Officer Kapa's partner subsequently inventoried the weapon.

The State charged defendant with armed violence (720 ILCS 5/33A—2(a) (West 2002)), aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(2) (West 2002)), unlawful use of a weapon (720 ILCS 5/24—1(a)(4) (West 2002)), two counts of aggravated unlawful use of a

weapon (720 ILCS 5/24—1.6(a)(1), (a)(3)(C) (West 2002)) and attempted fleeing or attempting to elude a peace officer (625 ILCS 5/11—204.1(a)(1) (West 2002)). The case proceeded to a bench trial. The parties stipulated that defendant did not possess a firearm owner's identification card and that he had a 1997 misdemeanor conviction for unlawful use of a weapon.

Since none of the people at whom defendant shot testified, the court found defendant not guilty of aggravated discharge of a firearm. The court found defendant guilty on all other counts, with the armed violence count being predicated on the aggravated fleeing or attempting to elude felony. Following the denial of defendant's posttrial motions, the court sentenced defendant to concurrent terms of 15 years for the armed violence conviction and 3 years for the aggravated fleeing or attempting to elude conviction. The convictions for unlawful use of a weapon and aggravated unlawful use of a weapon merged into the conviction for armed violence.

## ANALYSIS

### Reasonable Doubt

Defendant first argues that he was not proven guilty of any of the charges beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence, we must determine, viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime were proven beyond reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 330, 743 N.E.2d 52 536 (2000). It is for the trier of fact, here the trial court, to determine the weight to be given to the witnesses' testimony, the witnesses' credibility and the reasonable inferences drawn from the evidence. *People v. Milka*, 211 Ill. 2d 150, 178, 810 N.E.2d 33, 49 (2004). Circumstantial evidence is sufficient in itself to support a conviction, as long as the elements of the crime have been proven beyond a reasonable doubt. *Milka*, 211 Ill. 2d at 178, 810 N.E.2d at 49. We apply the same reviewing standard whether the evidence is direct or circumstantial. *People v. Maggette*, 195 Ill. 2d 336, 353, 747 N.E.2d 339, 349 (2001).

Defendant argues that the State failed to prove him guilty of aggravated fleeing or attempting to elude and, concomitantly, of armed violence, because it failed to prove that he drove at a rate of speed at least 21 miles over the legal speed limit after becoming aware of any visual or audible signal to stop.

■■ The court convicted defendant of armed violence pursuant to section 33A—2(a) of the Illinois Criminal Code of 1961, which provides that, with certain enumerated felonies excepted, "[a] person commits

armed violence when, while armed with a dangerous weapon, he commits any felony defined by Illinois Law." 720 ILCS 5/33A—2(a) (West 2002). The court found that defendant, while armed with the handgun, committed the felony of aggravated fleeing or attempting to elude a peace officer in violation of section 11—204.1(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11—204.1(a)(1) (West 2002)), which provides:

> "The offense of aggravated fleeing or attempting to elude a police officer is committed by any driver or operator of a motor vehicle who flees or attempts to elude a police officer, after being given a visual or audible signal by a police officer in the manner prescribed in subsection (a) of Section 11—204 of this Code, and such flight or attempt to elude:
>> (1) is at a rate of speed at least 21 miles per hour over the legal speed limit[.]" 625 ILCS 5/11—204.1(a)(1) (West 2002).

Section 11—204 prescribes that the visual or audible signal be

> "a visual or audible signal by a peace officer directing such driver or operator to bring his vehicle to a stop ***. The signal given by the peace officer may be by hand, voice, siren, red or blue light. Provided, the officer giving such signal shall be in police uniform, and, if driving a vehicle, such vehicle shall display illuminated oscillating, rotating or flashing red or blue lights which when used in conjunction with an audible horn or siren would indicate the vehicle to be an official police vehicle." 625 ILCS 5/11—204(a) (West 2002).

■ Officer Salazar testified that the speed limit on Mackinaw is 35 miles per hour and that defendant was traveling at 70 to 80 miles per hour. This is at least 35 miles over the posted speed limit.[1] He further testified that his squad car's siren and emergency lights were engaged during the pursuit, the squad was marked and he and his partner were in full uniform. Officer Kapa testified that he heard sirens as he approached the eastbound pursuit scene on 87th, before the Lexus and pursuing squad turned onto Burley. The squad's siren and lights, in conjunction with the officers' uniforms and marked squad, establish the section 11—204(a) requirements for "a visual or audible signal by a peace officer directing [a driver] to bring his vehicle to a stop."

Officer Salazar did not state at exactly what point in the pursuit he activated the lights and siren. However, his statement that he and Officer Whelan activated those signals came immediately following his testimony that he pursued the Lexus up Mackinaw and that it was going approximately 70 to 80 miles per hour, and before he detailed the remainder of the pursuit, including the Lexus' subsequent turns onto

---

[1]Although Officer Salazar testified that defendant traveled at 60 miles per hour on Burley, he did not mention the speed limit on that street.

87th and then onto Burley. The inference is clear that he activated his emergency lights and siren while pursuing defendant on Mackinaw. It is also clear that defendant failed to stop once those signals were engaged. Accordingly, Officers Salazar's and Kapa's testimony shows that the audible and visual signals were engaged after the pursuit commenced on Mackinaw, during the time defendant was traveling in excess of 21 miles over the speed limit, and that defendant failed to stop when the sirens and light were engaged.

Defendant posits that, because Officer Whelan failed to specify that the "emergency lights" he activated were the "illuminated oscillating, rotating or flashing red or blue lights" required by section 11—204(a), there is insufficient evidence to show that Officer Salazar gave the requisite visual signal to stop. Pursuant to section 11—204(a), the purpose of requiring use of a vehicle's "illuminated oscillating, rotating or flashing red or blue lights" with a siren is so that they "would indicate the vehicle to be an official police vehicle." Officer Salazar was driving a marked squad car and engaged the squad's siren as well as the "emergency lights" when he gave chase. Accordingly, it can reasonably be inferred that Officer Salazar activated the squad's "illuminated oscillating, rotating or flashing red or blue lights" when he activated the siren and gave chase, clearly giving defendant a visual signal to bring the Lexus to a stop. Based on the officers' credible testimony, there is sufficient evidence to support the court's finding that defendant is guilty of aggravated fleeing or attempting to elude beyond a reasonable doubt. Since this was defendant's first conviction for this offense, he was guilty of a Class 4 felony. 625 ILCS 5/11—204.1(b) (West 2002).

Given that defendant was guilty beyond a reasonable doubt of the felony of aggravated fleeing or attempting to elude, if he was armed with a dangerous weapon at the time he committed the offense, he would also be guilty of armed violence pursuant to section 33A—2(a). It is uncontested that a .40-caliber semiautomatic handgun is a dangerous weapon. See 720 ILCS 5/33A—1(c) (West 2002). However, defendant argues that the State failed to prove him guilty of armed violence, as well as of unlawful use of a weapon and aggravated unlawful use of a weapon, because it failed to prove beyond a reasonable doubt that the handgun recovered was ever in defendant's possession. He also argues that he was not proven guilty of armed violence because the State failed to prove that he was in possession of the handgun when he became aware of any visual or audible signal to stop. Circumstantial evidence is sufficient to prove that a defendant was armed while committing an offense. *People v. Hall*, 117 Ill. App. 3d 788, 804, 453 N.E.2d 1327, 1339 (1983).

Here, the evidence shows that Officers Salazar and Whelan heard six or seven shots from the direction of the Lexus; witnessed muzzle blasts from inside the Lexus; saw only one occupant, the driver, in the Lexus; gave chase on Mackinaw; activated their marked squad car's emergency lights and siren on Mackinaw; saw a silver object thrown from the Lexus after the turn onto Burley; never lost sight of the Lexus; found only defendant in the Lexus when it stopped; and saw spent .40-caliber cartridges in the Lexus. It also shows that Officer Kapa saw a silver object thrown from the Lexus during the chase on Burley; stopped immediately to retrieve the object; and found a loaded, chrome-colored .40-caliber semiautomatic handgun on the ground in the area where the object would have landed. Since defendant was the only occupant of the Lexus, the logical conclusion is that defendant possessed the gun. The evidence is sufficient to show beyond a reasonable doubt that the handgun recovered from the ground was previously in defendant's possession and that it was in his possession when Officer Salazar activated his emergency lights and siren while chasing defendant on Mackinaw.

To be "armed" within the meaning of the armed violence statute entails that the defendant either had a dangerous weapon in his possession or had "immediate access to or timely control over" the dangerous weapon during the commission of the underlying felony. (Emphasis omitted.) *People v. Condon*, 148 Ill. 2d 96, 110, 592 N.E.2d 951, 958 (1992). In *Condon*, the court reversed a defendant's conviction for armed violence where the defendant was arrested in his kitchen on a drug charge but had no weapons either on his person or in the room. Although there were numerous guns found elsewhere in the residence, the court held that defendant did not have immediate access to or timely control over a weapon when police entered and there was no evidence that the defendant possessed or carried a weapon during the commission of the felony underlying the armed violence charge and, therefore, his conviction for armed violence could not be sustained. *Condon*, 148 Ill. 2d at 110, 592 N.E.2d at 958. Here, there is no question that defendant had immediate access to or timely control over the handgun during his aggravated fleeing felony given that, as previously determined, he had not yet disposed of the gun when Officer Salazar gave the audible and visual signals to stop.

Defendant argues, however, that, because he threw the gun away when he realized police were after him, he falls within the holding of *People v. Smith*, 191 Ill. 2d 408, 732 N.E.2d 513 (2000), and the crime of armed violence was not proven. In *Smith*, the defendant dropped an unloaded handgun out of his apartment window when he became aware of police approaching the apartment to execute a search war-

rant. The appellate court affirmed the circuit court's finding that defendant was guilty of armed violence and of its predicate felony, unlawful possession of a controlled substance. Following *Condon,* our supreme court reversed, concluding that defendant did not commit armed violence because he did not have immediate access or timely control over the weapon when the police entered. *Smith,* 191 Ill. 2d at 412, 732 N.E.2d at 515. In both *Condon* and *Smith,* there was no evidence that either defendant had used, displayed or possessed a weapon during the underlying felony. Such is not the case here, where the evidence shows that, although defendant did throw the loaded handgun away before he stopped and was arrested, he had it in his immediate possession and control while he was fleeing from police northbound on Mackinaw at over 21 miles per hour after being given the signals to stop, *i.e.,* during the felony of aggravated fleeing or attempting to elude.

This case is more similar to *People v. Harre,* 155 Ill. 2d 392, 614 N.E.2d 1235 (1993), than to *Condon* or *Smith.* In *Harre,* the unarmed defendant was standing next to the closed passenger door of a car when confronted by police. There were two loaded guns on the front seat of the car. In order to access the guns, the defendant would have had to reach through the partially opened passenger window or open the car door. In contrast to *Condon,* our supreme court in *Harre* determined that the defendant did have direct access to a dangerous weapon even though it was not in his immediate possession when he was confronted by police. More importantly, the court determined that circumstantial evidence supported the inference that the defendant had, moments before his apprehension, been riding in the car on his way to a narcotics delivery with a loaded weapon inches from his grasp. *Harre,* 155 Ill. 2d at 400, 614 N.E.2d at 1239.

The court held it to be beyond a reasonable doubt that defendant had immediate access to or timely control over the weapons while riding to the narcotics delivery and that the evidence, therefore, in contrast to *Condon,* supported the jury's finding that defendant had immediate access to or timely control over the weapons during the course of the felony underlying the armed violence conviction. *Harre,* 155 Ill. 2d at 400, 614 N.E.2d at 1239. As explained in *Harre,* "the determination of whether a defendant is armed is not made at the moment of arrest. Rather, armed violence occurs if a defendant commits a felony while having on or about his person a dangerous weapon or if a defendant is otherwise armed." (Emphasis omitted.) *Harre,* 155 Ill. 2d at 401, 614 N.E.2d at 1240; 720 ILCS 5/33A—1(a) (West 2002). Such clearly occurred here, where the defendant was shown to have a loaded handgun in his possession while fleeing from or attempting to elude police.

The purpose of the armed violence statute is to deter felons from using dangerous weapons, thereby minimizing the deadly consequences which may result when a felony victim resists. *Condon*, 148 Ill. 2d at 109, 592 N.E.2d at 957. In *Smith*, because the defendant dropped the gun out of the window when he saw the police, the court determined that he "exhibited no propensity to violence" and that permitting an armed violence conviction to stand against him would frustrate rather than serve the statute's purpose of deterring criminals from involving themselves and others in potentially deadly situations. *Smith*, 191 Ill. 2d at 412-13, 732 N.E.2d at 515. Citing *Smith*, defendant asserts that he is not guilty of armed violence because, in order to avoid violence, he discarded the handgun when he realized the police were following him and he was no threat.

Given that defendant had just fired six or seven shots in the direction of a group of bystanders and had chosen to retain the weapon while he attempted to elude police, unlike the defendants in *Condon* and *Smith*, his propensity for violence and willingness to engage in a deadly situation were proven. While fleeing from police as a result of that shooting, he had in his car and immediately accessible the loaded handgun he had just used in the shooting. As in *Harre*, the fact that defendant threw the dangerous weapon out before he was arrested and so did not have it in his immediate possession when arrested does not mitigate the fact that it was within his immediate access and timely control during the course of the underlying felony. Accordingly, because the evidence shows that defendant had immediate access to and timely control over the handgun while in the Lexus and did not throw it away until he had traveled several blocks *after* Officer Salazar activated his audible and visual signals to stop and, concomitantly, after being confronted by police, the court could reasonably find that defendant was armed with a dangerous weapon while committing the felony of aggravated fleeing or attempting to elude and is guilty of armed violence beyond a reasonable doubt.

## Proportionate Penalty Review

■ Defendant argues that his conviction for armed violence predicated on aggravated fleeing or attempting to elude is unconstitutional and must be reversed. Defendant asserts that it violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because (1) a 15-year sentence for possessing a gun while fleeing from police shocks the moral conscience; (2) the armed violence conviction is disproportionate to the equivalent or greater offense of aggravated unlawful use of a weapon; and (3) the armed violence statute, which punishes mere possession of a firearm, is

disproportionate to the offenses of aggravated battery with a firearm, aggravated discharge of a firearm, reckless discharge of a firearm and aggravated unlawful use of a weapon.

A statute is presumptively constitutional. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005). For that reason, the party challenging a statute has the burden of proving that a constitutional violation exists. *Sharpe*, 216 Ill. 2d at 487. We review the question of whether a statute is constitutional *de novo*. *Sharpe*, 216 Ill. 2d at 486-87.

The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Prior to October 6, 2005, there were three separate tests which could be used in determining whether the legislature set a penalty according to the seriousness of the offense:

> "First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. [Citations.] Second, a penalty violates the proportionate penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely. [Citations.] Finally, the proportionate penalties clause is violated where offenses with identical elements are given different sentences." *People v. Moss*, 206 Ill. 2d 503, 522, 795 N.E.2d 208 (2003), overruled by *People v. Sharpe*, 216 Ill. 2d 481 (2005).

However, on October 6, 2005, our supreme court in *People v. Sharpe*, 216 Ill. 2d 481 (2005), held that the second test, commonly known as the cross-comparison test, could not be used to challenge a penalty under the proportionate penalties clause. *Sharpe*, 216 Ill. 2d at 487, 519, 533. Under the cross-comparison test, a defendant could compare the penalty for an offense with the penalty for a different offense, an offense with different elements. *Sharpe*, 216 Ill. 2d at 521. Finding that such an approach created badly reasoned, unworkable law and infringed on the power of the legislature to set penalties, the *Sharpe* court determined that the cross-comparison test must be abandoned. *Sharpe*, 216 Ill. 2d at 521.

Defendant's second and third constitutional challenges are based on the cross-comparison test, challenging the proportionality of the penalty for armed violence predicated on aggravated fleeing or attempting to elude by comparing it to the penalties for aggravated battery with a firearm, aggravated discharge of a firearm, reckless discharge of a firearm and aggravated unlawful use of a weapon, all of which are different offenses from, and do not share the same elements as, the armed violence offense. Accordingly, because the cross-

comparison test cannot be used in proportionate penalty review, we cannot consider these arguments.

Defendant's remaining proportionate penalty challenge, made pursuant to the first test, is that his 15-year sentence for armed violence predicated on aggravated fleeing or attempting to elude, *i.e.*, for possessing a gun while fleeing from police, shocks the moral conscience. " '[T]he constitutional command that "penalties shall be proportioned to the nature of the offense" would justify interference with the legislative judgment only if the punishment was "cruel," "degrading" or "so wholly disproportionate to the offense committed as to shock the moral sense of the community." ' " *People v. Farmer*, 165 Ill. 2d 194, 210, 650 N.E.2d 1006, 1014 (1995), quoting *People v. Gonzales*, 25 Ill. 2d 235, 240, 184 N.E.2d 833 (1962), quoting *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 421, 36 N.E. 76 (1894). Such interference with the legislature's determination of the appropriate sentence for armed violence is not warranted here.

Our legislature enacted the armed violence statute " 'to respond emphatically to the growing incidence of violent crime.' " *People v. Alejos*, 97 Ill. 2d 502, 507-08, 455 N.E.2d 48, 50 (1983), quoting *People v. Graham*, 25 Ill. App. 3d 853, 858, 323 N.E.2d 441 (1975). As the legislature explained, "[t]he use of a dangerous weapon in the commission of a felony offense poses a much greater threat to the public health, safety, and general welfare, than when a weapon is not used in the commission of the offense." 720 ILCS 5/33A—1(a)(1) (West 2002). "[T]he chances that violence will erupt and cause great bodily harm because of the weapon are increased when a felony is committed ***." *Alejos*, 97 Ill. 2d at 508-09, 455 N.E.2d at 51. Accordingly, "[t]he stiff punishment mandated by the armed-violence provision is intended not only to punish the criminal and protect society from him but also to deter his conduct—that of carrying the weapon while committing a felony." *Alejos*, 97 Ill. 2d at 509, 455 N.E.2d at 51.

If ever there was a felony offense during which the use of a deadly weapon should be deterred, it is a high-speed flight from or attempt to elude police. The possible consequences to the peace officers involved, and to any citizens unlucky enough to be nearby, if defendant decided to employ that deadly weapon, especially a firearm, are unquestionable. It is not the case, as defendant posits, that defendant's felony offense of armed violence predicated on aggravated fleeing or attempting to elude was merely a misdemeanor offense of unlawful use of a weapon that was enhanced to a felony simply because defendant was driving more than 20 miles over the speed limit. It is not just the speed of defendant's car that elevated the offense of aggravated fleeing or attempting to elude to the status of a felony. It is the fact that this

speeding occurred in an attempted flight from peace officers, from uniformed police in a marked squad car who had given defendant a signal to stop. Defendant's flight from police, his refusal to stop when so ordered by the civil authority sworn to protect our lives, laws and property, elevates his offense to a felony, a felony then exacerbated by defendant's decision to carry a firearm during its commission.

Imposition of a 15-year sentence, a stringent penalty prescribed by the legislature as necessary to achieve its objective of discouraging offenders from carrying weapons during commission of a felony, reflects the seriousness of the offense. *People v. Lombardi*, 184 Ill. 2d 462, 470-71, 705 N.E.2d 91, 96 (1998). There is no guarantee of proportionality between a crime and the length of a sentence. *Farmer*, 165 Ill. 2d at 209, 650 N.E.2d at 1014. The sentence may be harsh, but it is not cruel, degrading, or so grossly disproportionate to the offense as to shock the moral sense of the community. The sentence stands.

For the reasons stated above, we affirm the decision of the trial court.

Affirmed.

HOFFMAN, P.J., and ERICKSON, J., concur.