NOTICE

Decision filed 11/20/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230632-U

NO. 5-23-0632

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-1144 |
| | ) | |
| ANDRE D. CROSS, | ) | Honorable |
| | ) | Lindsey A. Shelton, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT* delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's conviction for armed violence is affirmed where, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found him guilty beyond a reasonable doubt.

¶ 2    The defendant, Andre D. Cross, was found guilty of two counts of armed violence following a jury trial. The circuit court of Macon County merged both armed violence convictions pursuant to the one act one crime rule. The defendant appeals his armed violence conviction. He argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that

---

*Originally Justice Welch was assigned to the panel. Justice Hackett was later substituted on the panel and has listened to oral arguments and read the briefs.

1

he committed the underlying offense while armed with a dangerous weapon. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On September 21, 2021, the State charged the defendant via information with two counts of armed violence, both Class X felonies, and both predicated on the felony of aggravated fleeing or attempting to elude.[1] See 720 ILCS 5/33A-2(a), 33A-3(a) (West 2020). The State filed amended informations concerning those charges on June 13, 2023. That same day, the parties proceeded to a jury trial. The trial took place over three days: June 13, 14, and 15.

¶ 5    The following facts were adduced at trial. On the night of September 15, 2021, members of the Decatur Police Department's Street Crimes Unit (SCU), a police team with a primary focus on drug dealers, violent criminals, and gun offenders, were patrolling Decatur streets alongside members of the department's Community Action Team (CAT), a police team with a primary objective to identify high crime areas and seize illegally possessed firearms. Members of the SCU drove unmarked vehicles, while members of the CAT drove marked squad cars. Members of the SCU also wore plain clothes and marked black tactical vests, and CAT members usually wore full police uniforms.

¶ 6    Detective Morey, a member of the SCU, rode as a passenger in a marked patrol vehicle driven by Sergeant Sawyer. The patrol car was equipped with a video system. Detective Morey observed a silver Chevrolet Impala and believed that he recognized the driver as an individual who "had affiliations with some various crimes in the city of Decatur." However, he later discovered

---

[1]The State also charged the defendant with unlawful possession of a weapon by a felon and attempted first degree murder. At trial, the jury found the defendant not guilty of attempted first degree murder; and on August 11, 2023, the State dismissed the unlawful possession charge. As this appeal only involves the armed violence conviction, this disposition will focus on the charges pertaining to that conviction.

that his preliminary identification was mistaken. Detective Morey used the police radio to communicate the Impala's description and direction of travel to the unmarked vehicles working with them. After following the Impala for multiple blocks, officers observed that the driver was driving "suspiciously." Specifically, officers observed the vehicle rapidly accelerating to leave an area where marked squad cars were and entering and immediately exiting multiple business lots. Officers ran the registration of the Impala and speculated that the vehicle might be heading toward the 1400 block of North Edward Street. Detective Morey was familiar with that address because there had been multiple prior calls for service there involving shots fired. The Edward Street area was also generally known as a "tough" neighborhood with "a fair share of crime," including drive-by shootings and other gun violence incidents. Detective Morey and Sergeant Sawyer eventually conducted a traffic stop on the Impala for traffic violations at the corner of Jasper Street and Prairie Avenue. Detective Morey and Sergeant Sawyer's car was directly behind the Impala. Multiple other marked and unmarked squad cars were also present.

¶ 7    Detective Morey wore a body camera but forgot to turn it on properly. When he realized that his camera was off, around two minutes after the initiation of the traffic stop, he immediately turned the camera on. Detective Morey got out of his marked squad car and approached the passenger side of the Impala with a flashlight. He shined the light into the car. He noticed that the defendant, the driver and sole occupant, had one hand on or about the steering wheel gearshift area, but he could not see the defendant's other hand. He did not see a gun.

¶ 8    As Detective Morey stood at the front passenger side of the Impala, K9 Detective Larner, accompanied by his police dog, parked his marked squad car behind another squad car, both behind the Impala. Larner's car was equipped with a video system. Two members of the SCU, Lieutenant Rosenbery and Detective Jason Hesse, also pulled their white Toyota Camry several feet in front

of the Impala at a northwest angle. Lieutenant Rosenbery drove, and Detective Hesse sat in the passenger seat, wearing a camera affixed to the center of his chest that recorded audio and video. There was a gap between the Camry and the curb, and as long as the Camry's passenger door remained closed, the Impala would be able to drive forward through the gap without making contact with the Camry. Two members of the CAT, Detective Clark and Officer Skalon, parked their marked patrol vehicle in a northeastern direction towards the driver's side of the Impala. The gap between Detective Clark's car and the Camry was larger than the gap between the Camry and the curb.

¶ 9    Three times, back to back, Detective Larner advised the Impala driver over a PA system to put the vehicle in park. To prevent a vehicle pursuit from ensuing, Detective Morey attempted to get the defendant to put the Impala into park, shut it off, and give Detective Morey the keys. While the defendant initially shut the vehicle off, he refused to give Detective Morey the keys. The defendant eventually started the Impala back up again. Detective Hesse wanted to put out tire deflation sticks in case the Impala decided to flee. Detective Hesse heard Detective Larner say that the vehicle's reverse lights had come on. At this point, Detective Hesse was still in the front passenger seat of the Camry with the door closed. When Detective Hesse heard the Impala's engine start and saw the Impala slowly reverse, he exited the passenger door to deploy the tire deflation sticks. As Detective Hesse exited the Camry, the Impala drove straight at him. Detective Hesse jumped to avoid being hit by the Impala. Detective Hesse was not injured, but the Impala struck and hyperextended the Camry's open passenger side door.

¶ 10    Lieutenant Rosenbery commanded officers to pursue the Impala, which had accelerated through the intersection and turned northbound on Jasper Street. However, due to the damage the Camry had sustained, Lieutenant Rosenbery and Detective Hesse were unable to join the pursuit.

4

Detective Clark and Officer Skalon led the pursuit, Detective Larner activated his siren and lights and joined in a support position, and Detective Morey and Sergeant Sawyer joined in their marked squad car.

¶ 11    During the pursuit, officer speeds reached roughly 90 miles an hour in areas where the posted speed limit was 30 miles an hour. Over a police radio system, officers communicated the direction of the defendant's travel, the speeds, and whether pedestrians were present. Officers observed the defendant disregarding at least two red lights and two stop signs. The pursuit lasted approximately five to six minutes, and traversed streets, alleys, and vacant lots. At one point, Detective Morey and Sergeant Sawyer's car was lead vehicle behind the defendant, approximately half a block away, when the defendant turned southbound into an alley behind North Edward Street. Detective Morey and Sergeant Sawyer followed the defendant into the alley, which was "pretty dark" until about a quarter of the way down. Detective Morey noticed a tall fence on the driver's side. Detective Morey knew that, if the defendant wished to eject contraband from his vehicle here, he would have to throw it out the driver's side window. The pursuit eventually stopped around a mile from the initial traffic stop, in the Wabash Crossing area near a housing complex. The defendant exited the vehicle while it was still moving and ran.

¶ 12    After a brief foot chase, officers took the defendant into custody. Detective Clark found a cellular device in a grassy area approximately 15 to 20 feet away from where the defendant had fled his vehicle. Detective Clark collected the cellular device and placed it into evidence. Due to their experience with high-speed car chases, Detective Morey and Sergeant Sawyer believed that the defendant had thrown contraband from his vehicle. They told Detective Larner to deploy his dog in the 1400 North Church Street area to search for items of evidentiary value that the defendant may have discarded there. Detective Larner did not find anything in that area. Detective Morey

5

then directed K9 handler Snyder to deploy his dog in the Wabash Crossing area where the defendant had been taken into custody, but Snyder did not find anything there.

¶ 13   Detective Morey then directed Snyder to deploy his dog in the Edward Street alleyway to search for items the defendant may have discarded there. Snyder deployed his dog in the alleyway, commanding the dog to locate items with human odor on them. Snyder followed the dog to a closed, tall, chain-link fence along the alleyway. The fence was somewhere between 6 to 10 feet tall. The dog stayed near the fence, indicating to Snyder that "he was in odor of an object but not physically able to get to *** [it] because of the physical barrier that the fence was presenting." Snyder illuminated the backyard behind the fence with his flashlight and observed a gun and separate light or laser. Snyder then told Detective Morey and Sergeant Sawyer to come back to the Edward Street area.

¶ 14   Upon arriving at the Edward Street area, Snyder directed Detective Morey and Sergeant Sawyer to the fence and backyard area. Snyder estimated the items were about 8 to 10 feet on the other side of the fence. The officers contacted the homeowner, and she allowed the officers to retrieve the items from her backyard. The items included a loaded 9-millimeter Glock 17 handgun and a separate light or laser made to be affixed to a handgun. The distance between the two items was several feet. There was a metal device on the rear of the handgun with deep scrapings. Detective Morey recognized this as a "switch," a street term for a device that, when installed on Glock handguns, allowed them to be switched from semi-automatic to fully automatic. Inside the handgun was an extended magazine, which allowed the gun's round capacity to increase from 17 to approximately 33. Detective Morey also noticed tire markings in the alley. Detective Morey used a department issued iPhone to record a video depicting the Impala's flight path and the area where the firearm was ultimately located. He also used the phone to photograph the firearm and

light or laser. These photographs were shown to the jury. Detective Morey then collected the items, and Sergeant Sawyer placed them into evidence. After Officer Skalon took buccal swabs from the defendant, Sergeant Sawyer also placed those into evidence.

¶ 15    The department extracted information from the cellular device, and the defendant was determined to be the device's owner. Detective Morey viewed photographs that were on the device. One of these photographs was of a handgun with a switch and light installed on it. The relevant portion of this photograph was shown to the jury. Detective Morey testified that the items in the photograph looked very similar to the items recovered at the Edward Street area. In particular, the light attachment in the photograph and the light attachment recovered at the scene both had a red ring around them. However, because he was unable to read the serial number of the gun in the photo, Detective Morey could not be sure that the gun in the photo was the recovered gun. Detective Morey testified that the gun would comfortably fit and remain hidden underneath a car seat.

¶ 16    Jennifer Acosta-Talbot, an expert in the determination of biology samples on material who worked at the Illinois State Police crime laboratory, swabbed the items recovered from the Edward Street area. She created sample 1A from the gun's grip, 1B from the gun's grooved surface, 1C from the light attachment, and 2A from the magazine. She then forwarded all the samples to the DNA department within the Illinois State Police crime laboratory. Svetlana Gershburg, a forensic scientist in the biology DNA section of the Illinois State Police crime laboratory, testified at trial as an expert in DNA and biology. Gershburg explained that, while the vast majority of DNA was the same, scientists like herself examined specific regions called short tandem repeats, or STRs. In forensic DNA analysis, scientists looked for differences between people's DNA at 23 different STR regions and compared them against a known standard. Scientists then used a machine called

7

a genetic analyzer to write the results of the analysis. In the case of "mixtures," which occurred when more than one person's DNA was present in samples, scientists used a computer program (called STRmix) to identify and interpret the mixtures. The known standard would then be entered into the program, which calculated the likelihood ratio that the standard was present in the mixture.

¶ 17     In this case, once Gershburg entered the samples and the defendant's buccal swabs into STRmix, she found that sample 1A was a mixture of four people, and the likelihood ratio "provided very strong support" that the defendant was a contributor to that mixture. Gershburg explained that "very strong support" was a verbal scale term which she used because "a number taken out of context [does] not really [say] much." Gershburg specified that sample 1A was "approximately 5.7 quintillion times more likely to originate from [the defendant] and three other" individuals than from four unknown individuals. Quintillion, Gershburg explained, was a number with "18 zeros after the digit." Gershburg also found that the defendant's DNA profile "[lined] up with the second contributor" to the mixture, constituting 27% of the mixture. Gershburg found that sample 1B was also a mixture of four people, that it was 19 quintillion times more likely to originate from the defendant and three other individuals than from four unknown individuals, and that the defendant's DNA profile constituted 68% of the mixture. Sample 1C was a mixture of three people, it was roughly 3.5 quadrillion times more likely to originate from the defendant and two other individuals than from three unknown individuals, and the defendant's DNA profile constituted 12% of the mixture. Gershburg could not analyze sample 2A because it was a mixture of more than four people, and STRmix was only validated to analyze a maximum of four people. Gershburg concluded that it was "significantly more likely that [the defendant's] DNA [was] present" than not. However, Gershburg admitted that her data could not prove exactly when the DNA was transferred onto the evidentiary items, and that such transfers could have happened months before

8

the police retrieved the items, although DNA could be destroyed by environmental factors such as UV light and bacteria.

¶ 18     During their deliberations, the jury submitted questions to the trial court. The jury asked for the definitions of "speculation," "reasonable inference," and "reasonable doubt"; whether the phone had been found on the defendant or whether he had "toss[ed]" it; and whether the Impala was registered in the 1400 North Edward Street area. To all these queries, the trial court responded that the jurors should rely on their own definitions and memories, as well as refer to the submitted jury instructions. On the jury's copy of the instructions, the jurors made various markings, which included circling this line: "Second proposition: that when the defendant committed the offense of aggravated fleeing and eluding, he was carrying on or about his person or was otherwise armed with a handgun." The jury found the defendant guilty of both armed violence counts.

¶ 19     On August 11, the trial court held a hearing to rule on the defendant's posttrial motion for a new trial and to determine the defendant's sentence. Defense counsel argued that there had been insufficient evidence presented at trial regarding whether the defendant had been "armed" as defined by the armed violence statute. Defense counsel asked the court to set aside both guilty judgments and grant the defendant a new trial. In the alternative, defense counsel argued that pursuant to the one act one crime rule (see *People v. King*, 66 Ill. 2d 551, 566 (1977)), the court should set aside one of the armed violence counts. The court found that there had been sufficient evidence presented at trial and denied the defendant's motion for a new trial. However, the trial court agreed with the alternative argument, merging both counts and entering judgment on only one count of armed violence. The court then sentenced the defendant to 20 years in prison, to be followed by an 18-month mandatory statutory release term. The defendant appeals.

9

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, the defendant argues that this court should reverse his conviction for armed violence where the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt. Specifically, the defendant claims that the evidence was insufficient to establish beyond a reasonable doubt that he was "armed" during the commission of the underlying offense. We disagree.

¶ 22    Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2. When reviewing the sufficiency of the evidence, the standard is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). This standard applies to all criminal cases, whether the evidence is direct or circumstantial. *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). "Circumstantial evidence alone is sufficient to sustain a conviction where it satisfies proof beyond a reasonable doubt of the elements of the crime charged." *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010).

¶ 23    In reviewing the sufficiency of the evidence, this court will not retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is the function of the jury to assess the credibility of witnesses, determine the appropriate weight of testimony, and resolve conflicts in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). The findings of the jury on such matters are therefore entitled to great weight, and this court will not substitute its judgment for that of the jury in these matters. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Furthermore, a jury is not obligated to "disregard inferences that flow normally from the evidence

10

before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Accordingly, this court will overturn a defendant's conviction only where the evidence is so "unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 24    "A person commits armed violence when, *while armed* with a dangerous weapon, he commits any felony defined by Illinois Law," except certain enumerated offenses. (Emphasis added.) 720 ILCS 5/33A-2(a) (West 2020). The purpose of the armed violence statute is to deter felons from using dangerous weapons, especially firearms, during the commission of felonies, as "the use of a firearm in the commission of a criminal felony offense significantly escalates the threat and the potential for bodily harm, and the greater range of the firearm increases the potential for harm to more persons." *Id.* § 33A-1(a)(2). The underlying felony of the defendant's armed violence conviction was aggravated fleeing or attempting to elude a peace officer, which was proven at trial by evidence that the defendant, a driver of a motor vehicle, fled a peace officer after being given a visual or audible signal by the officer, and his flight was at least 21 miles per hour over the legal speed limit and involved disobedience of two or more official traffic control devices. See 625 ILCS 5/11-204.1 (West 2020). On appeal, the defendant challenges only the sufficiency of the evidence that he committed this underlying felony *while armed*.

¶ 25    "[A] person is considered 'armed with a firearm' when he or she carries on or about his or her person or is otherwise armed with a firearm." 720 ILCS 5/2-3.6 (West 2020). More helpfully, "[t]o be 'armed' within the meaning of the armed violence statute entails that the defendant either had a dangerous weapon in his possession or had '*immediate access to* or *timely control over*' the dangerous weapon during the commission of the underlying felony." (Emphases added.) *People*

11

*v. Brown*, 362 Ill. App. 3d 374, 380 (2005) (citing *People v. Condon*, 148 Ill. 2d 96, 110 (1992)).

In *Condon*, our supreme court reversed defendant's conviction for armed violence where defendant was arrested in his kitchen on a drug charge but had no weapons either on his person or in the room, although there were numerous guns found elsewhere in the residence. *Condon*, 148 Ill. 2d at 110. Our supreme court held that defendant thus could not have had " 'immediate access to' or 'timely control over' " a weapon during the commission of the felony underlying his armed violence charge. *Id.*

¶ 26    "Circumstantial evidence is sufficient to prove that a defendant was armed while committing an offense." *Brown*, 362 Ill. App. 3d at 379 (citing *People v. Hall*, 117 Ill. App. 3d. 788, 804 (1983)). Here, unlike in *Condon*, the evidence presented at trial, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant had *immediate access to* or *timely control over* a gun while he fled from police. Specifically, the evidence was sufficient to support the State's theory that the defendant threw the gun from his vehicle mid-chase in an alleyway at the only time when police momentarily lost sight of him. At trial, officers testified that, throughout the pursuit, visual contact with the defendant was continuous other than during a very brief time in the alleyway. The gun and other items were found in a backyard behind a fence adjacent to the alleyway just after the defendant had been taken into custody. The fence had been on the driver's side of the defendant's vehicle as it drove down the alleyway. Detective Morey testified that the items recovered in the alleyway— the gun with a switch, the extended magazine, and the light attachment—looked very similar to items seen in a photograph recovered from the defendant's mobile device. Finally, the defendant's DNA was detected on the gun and light attachment. Thus, upon considering the evidence presented, a rational trier of fact could find beyond a reasonable doubt that the defendant had

12

*immediate access to* or *timely control over* the gun in his continuous possession while fleeing from the police and committing the underlying traffic offenses.

¶ 27                                III. CONCLUSION

¶ 28    Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the defendant was armed during the commission of the underlying offense. Therefore, the defendant's conviction for armed violence is affirmed.


¶ 29    Affirmed.