In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3108

DEVIN WELCH,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:08-cv-02051-MPM-DGB—**Michael P. McCuskey,** *Chief Judge.*

ARGUED DECEMBER 4, 2009—DECIDED MAY 4, 2010

Before POSNER, RIPPLE and WOOD, *Circuit Judges*.

RIPPLE, *Circuit Judge.* In 2005, Devin Welch pleaded guilty to unlawful possession of a firearm by a felon. He then brought a motion under 28 U.S.C. § 2255 to vacate his sentence. The district court denied the § 2255 motion in pertinent part. We granted a certificate of appealability to address two of Mr. Welch's contentions. First, he submits that his prior conviction for the Illinois crime of aggravated fleeing or attempting to elude a police officer cannot qualify as a "violent felony" within

the meaning of the Armed Career Criminal Act ("ACCA"). Second, he submits that his prior juvenile adjudication cannot be used to enhance his sentence beyond the statutory maximum because it was not obtained by a jury trial. For the reasons set forth in this opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

In 2005, Devin Welch pleaded guilty to unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). The presentence report ("PSR") indicated that Mr. Welch had four prior convictions that were "violent felonies" for purposes of the ACCA: two aggravated batteries, aggravated fleeing or attempting to elude a police officer and a juvenile adjudication for attempted armed robbery. Without the ACCA's statutory enhancement, the statutory maximum sentence for Mr. Welch's crime was 120 months.

At sentencing, Mr. Welch's counsel made no objections to the PSR, but Mr. Welch submitted handwritten memoranda making objections pro se. One of those objections was to the use of the previous convictions to enhance his sentence. The district court overruled the objections and sentenced Mr. Welch to 180 months' imprisonment, to be followed by a five-year term of supervised release. The district court did not rely on one of the aggravated battery convictions—for spitting—but, as a result of the other three violent felonies, Mr. Welch

was nonetheless subject to the ACCA's mandatory minimum sentence of 180 months' imprisonment.[1] *See* 18 U.S.C. § 924(e)(1). On direct appeal, Mr. Welch, through counsel, did not pursue any of the pro se objections. He contended only that the trial court had erred in failing to specify the number of required drug tests during the period of supervised release. We summarily affirmed the district court's judgment. *United States v. Welch*, No. 06-3385 (7th Cir. Feb. 21, 2007).

Mr. Welch next filed a pro se § 2255 motion. He contended that his conviction for aggravated fleeing or attempting to elude a police officer was not a violent felony because, under Illinois law, the offense is characterized as a "serious traffic offense but not something that presents a serious potential risk of physical injury to another." R.1 at 11.[2] He also contended that his juvenile adjudication could not be used to enhance his sentence beyond the statutory maximum consistent with the Sixth Amendment because it did not result from a jury trial; he also contended that his counsel had been ineffective for failing to raise this claim.[3]

The district court denied these aspects of the motion. In rejecting Mr. Welch's ACCA claim, it relied on *United*

---

[1] The Government concedes that if Mr. Welch's appeal is successful, he is entitled to be resentenced.

[2] R.__ refers to the record of the § 2255 proceeding.

[3] Mr. Welch also again challenged the district court's drug testing ruling. This aspect of the motion was granted, and is not at issue in this appeal. Also, Mr. Welch raised other ineffective assistance challenges that are not renewed on appeal.

*States v. Howze*, 343 F.3d 919, 921 (7th Cir. 2003), in holding that flights to avoid arrest categorically created a serious potential risk of injury to another and were thus violent felonies. In rejecting Mr. Welch's ineffective assistance claim, it noted that, at the time of sentencing, the circuits were divided 3-1 against Mr. Welch's position, with the Seventh Circuit silent. Thus, it was reasonable for counsel to choose not to raise the issue. Moreover, Mr. Welch suffered no prejudice because he had raised the issue pro se.

We initially granted a certificate of appealability only on the issue of ineffective assistance. We subsequently expanded the certificate to include the issue of whether Mr. Welch's conviction for aggravated fleeing or attempting to elude a police officer properly was classified as a violent felony in light of the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008).

## II

## ANALYSIS

### A.

#### 1.

Initially, we note that we have held that deviations from the Sentencing Guidelines generally are not cognizable on a § 2255 motion. *United States v. Scott*, 997 F.2d 340, 343 (7th Cir. 1993). Other circuits have reached a similar

conclusion.[4] However, *Scott* does not govern the situation before us for two reasons. First, *Scott* relied, in significant part, on the text of § 2255, and suggested that the Guidelines were not "laws of the United States." *Id.* at 341; *see also Taylor v. Gilkey*, 314 F.3d 832, 833 (7th Cir. 2002) ("Because the Guidelines are not 'laws' for purposes of § 2255, however, this argument could not support relief."); *Brannigan v. United States*, 249 F.3d 584, 588 (7th Cir. 2001) (same). That rationale does not apply here because the statutory text clearly permits relief if "the sentence was in excess of the maximum authorized by law." 28 U.S.C. § 2255(a). Here, Mr. Welch pointedly argues that his sentence, as enhanced by the ACCA, *is* above the statutory maximum, which would entitle him

---

[4] *See, e.g.*, *United States v. Mikalajunas*, 186 F.3d 490, 495-96 (4th Cir. 1999) (collecting cases); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999) ("Moreover, an error in the application of the Sentencing Guidelines does not warrant collateral relief under § 2255 absent a complete miscarriage of justice."); *Burke v. United States*, 152 F.3d 1329, 1332 (11th Cir. 1998) ("We thus hold that a claim that the sentence imposed is contrary to a post-sentencing clarifying amendment is a non-constitutional issue that does not provide a basis for collateral relief in the absence of a complete miscarriage of justice."); *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (collecting cases).

We also note that the Supreme Court has held that an error of law, as distinguished from a constitutional error, is cognizable under § 2255 only if it "constituted a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (internal quotation marks and citation omitted).

to relief.[5] Second, our decision in *Scott* was based in significant part on the difference between direct appeal and collateral attack, ultimately concluding "that arguments of the sort Scott proffers must be advanced on direct appeal or not at all." *Scott*, 997 F.3d at 343. However, "arguments of the sort" at issue here, where a change in law reduces the defendant's statutory maximum sentence below the imposed sentence, have long been cognizable on collateral review.[6]

---

[5] *See United States v. Peterman*, 249 F.3d 458, 462 (6th Cir. 2001) ("Courts have generally declined to collaterally review sentences that fall within the statutory maximum."); *United States v. Pregent*, 190 F.3d 279, 284 (4th Cir. 1999) ("Thus, while § 2255 applies to violations of statutes establishing maximum sentences, it does not usually apply to errors in the application of the Sentencing Guidelines."); *Auman v. United States*, 67 F.3d 157, 161 (8th Cir. 1995) ("While section 2255 does provide relief for cases in which 'the sentence was in excess of the maximum authorized by law,' this provision applies to violations of statutes establishing maximum sentences, rather than garden-variety Sentencing Guideline application issues."); *cf. United States v. White*, 584 F.3d 935, 948 (10th Cir. 2009) (holding that appeal waiver made in a plea agreement results in a miscarriage of justice "where the sentence exceeds the statutory maximum" (citation omitted)); *United States v. Sisco*, 576 F.3d 791, 796 (8th Cir. 2009) (same); *United States v. Guillen*, 561 F.3d 527, 531 (D.C. Cir. 2009) (same).

[6] In *Davis v. United States*, 417 U.S. 333 (1974), a change in intervening law narrowed the petitioner's statute of conviction, potentially excluding petitioner's conduct. The Supreme Court held that:

(continued...)

Finally, we note that the Government has waived any procedural default argument by failing to address the issue in its brief. *See Torzala v. United States*, 545 F.3d 517, 522 (7th Cir. 2008) ("Because the government did not assert procedural default as a defense in this action but instead chose to respond on the merits, however, the government has waived the procedural default.").

## 2.

We next must consider whether the rule announced in *Begay*, that a crime must be similar in kind to the enumerated offenses in order to qualify as a violent felony under the ACCA, is applicable under the Supreme Court's retroactivity framework. If it is, then the error of which Mr. Welch complains is cognizable in this collateral review proceeding.

New procedural rules that are established after a conviction becomes final generally do not apply on collateral

---

[6] (...continued)

> If [petitioner's] contention is well taken, then Davis' conviction and punishment are for an act that the law does not make criminal. There can be no room for doubt that such a circumstance "inherently results in a complete miscarriage of justice" and "present[s] exceptional circumstances" that justify collateral relief under § 2255.

*Id.* at 346-47 (brackets in original). As we shall demonstrate in the text, the situation before us is analogous.

review. *Teague v. Lane*, 489 U.S. 288, 310 (1988). New substantive rules, however, are not barred by the *Teague* rule. The Supreme Court has explained this distinction:

> New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him.

*Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004) (internal quotation marks and citations omitted, emphasis removed).

These substantive rules stand in contrast to procedural rules which:

> do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.

*Id.* at 352.

Our colleagues in the Tenth Circuit recently have addressed this substantive/procedural distinction. In *United States v. Shipp*, 589 F.3d 1084 (10th Cir. 2009), that court had to decide whether *Chambers v. United States*,

___U.S. ___, 129 S. Ct. 687 (2009), is to be applied retroactively.[7] As we shall discuss in detail later, *Chambers*, like

---

[7] One circuit granted a certificate of appealability on the question of *Begay*'s retroactivity as applied to the career offender Sentencing Guideline, but then held that "[b]ecause his status as a career offender is a non-constitutional issue that Coley could have raised on direct appeal, it is not cognizable on collateral review under § 2255." *United States v. Coley*, No. 08-15962, 2009 WL 2019859, at *3 (11th Cir. July 14, 2009) (per curiam).

One other circuit has stated in dicta that that circuit's holding that non-residential burglary is not per se a "crime of violence" under the Sentencing Guidelines is not retroactive. *United States v. Giggey*, 551 F.3d 27, 36 n.3 (1st Cir. 2008).

District courts have split on the question of *Begay*'s retroactivity. *Compare United States v. Ross*, No. 09-cv-779-bbc, 2010 WL 148397, at *4 (W.D. Wis. Jan. 12, 2010) (not retroactive); *United States v. Jones*, No. 6:09-7082-DCR, 2010 WL 55930, at *3-*6 (E.D. Ky. Jan. 4, 2010) (same); *Kirkland v. United States*, No. 3:09-CV-335 RLM, 2009 WL 3526185, at *8 (N.D. Ind. Oct. 22, 2009) (same); *United States v. Johnson*, No. 04-269 (MJD/AJB), 2009 WL 2611279, at *3-*4 (D. Minn. Aug. 24, 2009) (same); *Sun Bear v. United States*, No. CIV 08-3021, 2009 WL 2033028, at *3-*4 (D. S.D. July 9, 2009) (same); *United States v. Narvaez*, No. 09-cv-222-bbc, 2009 WL 1351811, at *1 (W.D. Wis. May 12, 2009) (same); *Lindsey v. United States*, No. 09-0249-CV-W-ODS, 2009 WL 2337120, at *2 (W.D. Mo. July 29, 2009) (same); *United States v. Campbell*, No. 6:06-812-HMH, 2009 WL 1254287, at *1 (D. S.C. May 1, 2009) (same), *with United States v. Fondren*, No. 4:06-CR-22 CEJ, 2009 WL 3246906, at *1 (E.D. Mo. Oct. 6, 2009) (retroactive);

(continued...)

<hr>

[7] (...continued)

*Kendrick v. United States*, No. 5:08-cv-447-Oc-10GRJ, 2009 WL 2958976, at *2 (E.D. Fla. Sept. 15, 2009) (same); *United States v. Blue*, No. 09-1108, 2009 WL 2581284, at *3-*4 (D. Kan. Aug. 20, 2009) (finding *Chambers* to be retroactive); *Frederick v. United States*, No. 08-22143-CV, 2009 WL 2488965, at *8 (S.D. Fla. Aug. 12, 2009) (retroactive) (adopting magistrate judge's report finding *Begay* to be retroactive); *McCarty v. United States*, No. 8:08-cv-1619-T-24TBM, 2009 WL 1456386, at *2 (M.D. Fla. May 22, 2009) (retroactive); *George v. United States*, 650 F. Supp. 2d 1196, 1200 (M.D. Fla. 2009) (same); *United States v. McElroy*, No. 09-CV-0040-CVE-PJC, 2009 WL 1372908, at *2-*3 (N.D. Okla. May 14, 2009) (same); *United States v. Radabaugh*, No. 08-CV-762-CVE-TLW, 2009 WL 565065, at *5 (N.D. Okla. Mar. 5, 2009) (same); *United States v. Leonard*, No. 08-CV-0389-CVE-FHM, 2009 WL 499357, at *3-*4 (N.D. Okla. Feb. 27, 2009) (same); *United States v. Glover*, No. 08-CV-0261-CVE-FHM, 2008 WL 2951085, at *4 (N.D. Okla. July 28, 2008) (same).

Those holding that the *Begay* rule is substantive have reasoned, just as the Tenth Circuit did, that "*Begay* limits the authority of a court to increase a defendant's punishment for certain types of conduct." *McElroy*, 2009 WL 1372908, at *3; *see also Frederick*, 2009 WL 2488965, at *8 (carrying a concealed firearm "is now categorically outside the reach of the federal statute"); *Blue*, 2009 WL 2581284, at *4 ("Defendants who have been sentenced on the basis of certain prior convictions may thus have been subjected to increased punishment that the law did not allow."); *McCarty*, 2009 WL 1456386, at *2 (holding that *Begay* "narrows the scope of § 924(e) by interpreting its terms, making the conduct for which Petitioner was sentenced no longer a valid basis for his sentence").

(continued...)

*Begay*, interpreted the ACCA and narrowed the scope of "violent felony." The Tenth Circuit held that *Chambers* articulated "a substantive rule of statutory interpretation." *Shipp*, 589 F.3d at 1089. A defendant who "does not constitute an 'armed career criminal'" after *Chambers* has "received 'a punishment that the law cannot impose upon him.'" *Id.* at 1091 (quoting *Schriro*, 542 U.S. at 352). Accordingly, the court held that Mr. Shipp's due process rights were violated and that he was entitled to collateral relief. *Id.*[8]

At the outset of our analysis, we recognize that, although *Begay* narrowed the scope of a criminal statute, it did not narrow any of the elements of a criminal offense. We also must recognize that Mr. Welch was convicted of, and punished for, unlawfully possessing a firearm, which is still criminal conduct after *Begay*. The question, therefore, is whether a statutory rule defining the scope of a sentencing enhancement that increases the maximum

---

[7] (...continued)

Those district courts holding that *Begay* is procedural have suggested that it "does not describe conduct that is beyond Congress' power to punish." *Lindsey*, 2009 WL 2337120, at *2. They also have contrasted "a new substantive rule" with "a rule of interpretation for determining the application of a sentencing enhancement under the Federal Sentencing Guidelines." *Sun Bear*, 2009 WL 2033028, at *4. At least one court has held that *Begay* is not retroactive because the Supreme Court has not said it is retroactive. *Campbell*, 2009 WL 1254287, at *1.

[8] Notably, both parties agree that the *Begay* rule is substantive.

allowable statutory sentence on the basis of a prior con-
viction is properly classified as substantive.

There is significant merit to the Tenth Circuit's analysis.
In essence, *Begay* narrowed substantially Mr. Welch's
exposure to a sentence of imprisonment. Without the
ACCA enhancement, Mr. Welch faced a statutory
*maximum* of 10 years' imprisonment. With the ACCA
enhancement, Mr. Welch faced a statutory *minimum* of 15
years' imprisonment. In short, the application of the
ACCA imposed, at a minimum, five years of imprison-
ment that the law otherwise could not impose upon
him under his statute of conviction. Such an increase in
punishment is certainly a substantive liability. By con-
trast, such an increase in punishment hardly resembles
a procedural device, as the term is used in *Schriro*. It does
not address the accuracy of the process afforded
Mr. Welch; it addresses the degree to which the Gov-
ernment may punish him for his violation of the law.

No doubt, the change at issue here is not the same as
the change at issue in *Schriro*. When the elements of a
crime are narrowed, that change serves to prohibit *any*
punishment for the conduct. *Begay* prohibits *some* of that
punishment. We believe, however, that this distinction
is one of degree, not one of kind. *Cf. McReynolds v. United
States*, 397 F.3d 479, 481 (7th Cir. 2005) (holding that
*Booker* was not retroactive because "[n]o conduct that
was forbidden before *Booker* is permitted today; no maxi-
mum available sentence has been reduced").

Therefore, the *Begay* rule is retroactively applicable
on collateral review.

**B.**

We now turn to Mr. Welch's substantive contentions regarding *Begay*'s application. He submits that his conviction for the Illinois offense of aggravated fleeing or attempting to elude a police officer cannot qualify, consistent with *Begay*, as a "violent felony" within the meaning of the ACCA.

**1.**

We shall begin our analysis by reviewing the law relevant to the interpretation of the ACCA.

The ACCA provides in pertinent part:

> In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be . . . imprisoned not less than fifteen years . . . .

18 U.S.C. § 924(e)(1). The ACCA goes on to define "violent felony" as follows:

> (B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife or destructive device that would be punishable by imprisonment for such term if committed by an adult, that—

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another; and
>
> (C) the term "conviction" includes a finding that a person has committed an act of juvenile delinquency involving a violent felony.

*Id.* § 924(e)(2)(B) & (C).

It is undisputed that the Illinois crime in question is punishable by imprisonment for a term exceeding one year,[9] and that it is not one of the crimes specifically enumerated in subsection (ii). Also, the statute does not necessarily require the use, attempted use or threatened use of physical force against the person of another. Therefore, this case centers around the residual clause,[10] or whether the crime "otherwise involves conduct that presents a serious potential risk of physical injury to another." *Id.* § 924(e)(2)(B)(ii).

---

[9] The statute provides that a first violation shall be a class 4 felony. 625 ILCS 5/11-204.1(b). A class 4 felony is punishable by a sentence of "not less than one year and not more than 3 years." 730 ILCS 5/5-4.5-45.

[10] The Supreme Court's recent decision in *Johnson v. United States*, ___ U.S. ___, 130 S. Ct. 1265 (2010), does not interpret this clause of the statute.

In its analysis of the scope of the ACCA, the district court relied on *United States v. Howze*, 343 F.3d 919 (7th Cir. 2003). In that case, we held that all escapes, including fleeing a police officer in a vehicle, were violent felonies. *Id.* at 922. We held that escaping or fleeing presented a serious potential risk of physical injury to another. *Id.* We reasoned that "the [ACCA] calls for an assessment of risk rather than actual outcomes, and the risk that someone will get hurt during recapture (or flight to avoid recapture) does not depend on how the offender got away in the first place." *Id.* We further noted that "flight may be even more dangerous than escape" because "[c]ollisions between fleeing vehicles and pedestrians or others who get in the way are common." *Id.* Although "many escapes do not entail flight to avoid capture . . . *all* flights involve that risk-creating conduct." *Id.* (emphasis in original).

*Howze* was decided before the Supreme Court decided *Begay*. In *Begay,* the Court held that, in order to be classified as a violent felony, it is not sufficient that the offense present a serious potential risk of physical injury to another. Additionally, the offense must be "roughly similar, in kind" to the enumerated offenses. *Begay*, 553 U.S. at 143. The listed offenses, the Court noted, "typically involve purposeful, violent, and aggressive conduct" such that it makes it "more likely that an offender, later possessing a gun, will use that gun deliberately to harm a victim." *Id.* at 144-45 (internal quotation marks and citation omitted). The offense before the Court, driving under the influence, did not require purposeful conduct, but was instead more akin to a strict liability crime. *Id.* at 145.

DUI, therefore, did not show an increased likelihood that the offender would point a gun and pull the trigger. *Id.* at 146.

We applied the *Begay* framework to a fleeing statute in *United States v. Spells*, 537 F.3d 743 (7th Cir. 2008). We held that fleeing an officer in a vehicle constituted a violent felony. *Id.* at 752. We held that the offense was "purposeful," because the statute required that it be done "knowingly or intentionally." *Id.* We also held that flight in a vehicle was inherently "aggressive." *Id.* "Taking flight calls the officer to give chase, and aside from any accompanying risk to pedestrians and other motorists, such flight dares the officer to needlessly endanger himself in pursuit." *Id.*

After *Spells*, the Supreme Court decided *Chambers*. There, the Court held that failure to report for penal confinement is not a violent felony. Failure to report does not present a serious risk of physical injury to another, and it is "a form of inaction, a far cry from the purposeful, violent, and aggressive conduct potentially at issue when an offender uses explosives against property, commits arson, burgles a dwelling or residence, or engages in certain forms of extortion." *Chambers*, 129 S. Ct. at 692 (internal quotation marks and citation omitted). The Court also noted that "an individual who fails to report would seem unlikely, not likely, to call attention to his whereabouts by simultaneously engaging in additional violent and unlawful conduct." *Id.* The Court also specifically distinguished failure to report from escape. *Id.* at 691.

After argument in the case now before us, we decided *United States v. Dismuke*, 593 F.3d 582 (7th Cir. 2010). In that case, we reconsidered whether the Wisconsin statute at issue in *Howze* could qualify as a violent felony in light of the Supreme Court's decisions in *Begay* and *Chambers*. Our focus was on a particular portion of that statute: the offense of "increasing the speed of the operator's vehicle or extinguishing the lights of the vehicle in an attempt to elude or flee." *Id.* at 590 (brackets omitted). We noted and reaffirmed, but did not rest upon, the *Spells* decision. We held that the Wisconsin statute required purposeful conduct because it required that the crime be done intentionally. *Id.* at 592. We also held that the conduct encompassed by the elements of the statute was violent and aggressive because it was "characterized by aggressive conduct with a similar potential for violence and therefore injury as the enumerated offenses." *Id.* at 594. We found in *Chambers* an implication that an escape from physical custody would satisfy *Begay* and cited several cases (including *Spells*) that explained how fleeing is a challenge to the officer's authority and is likely to result in a confrontation. *Id.* at 595.

Shortly after our decision in *Dismuke*, we decided *United States v. Sykes*, ___ F.3d ___, No. 08-3624, 2010 WL 843861 (7th Cir. Mar. 12, 2010). That case involved the same Indiana statute as the one at issue in *Spells*. The defendant acknowledged our holding in *Spells*, but asked that we abandon it. We declined the invitation and chose instead to reaffirm explicitly *Spells*. We stated that "its holding is good law and controls our case," and we noted the importance of stare decisis. *Id.* at *3.

**2.**

The Illinois statute under which Mr. Welch was convicted provides:

> The offense of aggravated fleeing or attempting to elude a peace officer is committed by any driver or operator of a motor vehicle who flees or attempts to elude a peace officer, after being given a visual or audible signal by a peace officer in the manner prescribed in subsection (a) of Section 11-204 of this Code, and such flight or attempt to elude:
>
> > (1) is at a rate of speed at least 21 miles per hour over the legal speed limit;
> >
> > (2) causes bodily injury to any individual;
> >
> > (3) causes damage in excess of $300 to property; or
> >
> > (4) involves disobedience of 2 or more official traffic control devices.

625 ILCS 5/11-204.1(a).

Unlike the fleeing statutes at issue in *Spells*, *Dismuke* or *Sykes*, this Illinois statute does not contain an explicit intent term. Mr. Welch submits that, because of this omission, the offense cannot satisfy the *Begay* standard. *Begay* itself removed explicitly strict liability crimes from the ACCA's reach. *United States v. McDonald*, 592 F.3d 808, 814 (7th Cir. 2010). Indeed, *Begay* held that a violent felony must involve "purposeful" conduct, and we have held squarely that a crime with a mens rea

of recklessness cannot qualify as a violent felony under the residual clause. *United States v. Smith*, 544 F.3d 781, 786 (7th Cir. 2008). Therefore, in order to qualify as a violent felony, a crime must involve intentional conduct.

We believe that the Illinois statute, although not having an explicit requirement of intentional conduct, does contain an implied requirement of intentional conduct. In *Mei v. Ashcroft*, 393 F.3d 737, 741-42 (7th Cir. 2004), we considered whether this same Illinois statute was a "crime of moral turpitude" for purposes of immigration law. In that context, we found an implied intent requirement in the statute, reasoning that "[i]t would be unlikely for the aggravated version of the offense to have dropped the requirement of willfulness [when the unaggravated version did contain such a requirement], though not impossible." Although Illinois cases provide little guidance,[11] we think *Mei* was correct for several reasons.

---

[11] In *People v. Brown*, 839 N.E.2d 596, 600 (Ill. App. Ct. 2005), the defendant contended that the evidence was insufficient to support his conviction for aggravated fleeing, because the State failed to prove that he drove 21 miles per hour over the speed limit "after becoming aware of any visual or audible signal to stop." The police officer testified that the squad car was marked and that its siren and lights were engaged. *See id.* at 601 ("The inference is clear that he activated his emergency lights and siren while pursuing defendant on Mackinaw."). The court held that this was sufficient to support the defendant's conviction, *id.* at 601, though it did not specify if
(continued...)

First, the statute does not punish a driver who "fails to stop" for an officer, but rather one who "flees or attempts to elude" an officer. While a "failure to stop" could be an unintentional act, "fleeing" implies willfulness. As the term is commonly used, "fleeing" implies something more than continued motion; it implies a *response* to some stimulus. The transitive form of the verb "flee" is defined as "to run away *from*" or "shun." Merriam-Webster's Collegiate Dictionary 445 (10th ed. 1998) (emphasis added). This implication is even stronger where the statute treats "fleeing" as the equivalent of "attempting to elude," for "attempt" is a specific intent crime. *See* 720 ILCS 5/8-4(a).

Moreover, speeding or driving through two stop signs while being chased by an officer, *with no intent to flee the officer*, is not the type of conduct that a statute about "fleeing" is crafted to punish. Illinois has enacted other provisions—traffic offenses—to punish running stop signs or speeding. *See* 625 ILCS 5/11-305 (obedience to traffic-control devices); 625 ILCS 5/11-601 (speeding). These traffic offenses are not felonies, or even misdemeanors, but rather are petty offenses.[12] Illinois also

---

[11] (...continued)

this evidence allowed the jury to infer that the defendant was aware of the pursuing officer or if such awareness was not required.

[12]     [U]nless otherwise declared in this Chapter with respect to particular offenses, it is a petty offense

(continued...)

makes it a separate misdemeanor to drive 40 miles per hour or more over the speed limit. 625 ILCS 5/11-601.5. Given this comprehensive statutory scheme, we believe it clear that the Illinois legislature did not intend to make it a felony to drive 20 miles per hour over the speed limit simply because a police officer happens to be in pursuit, rather than because the driver was intentionally evading that officer.

Similarly, Illinois has enacted no separate offense for causing injury while operating a vehicle. An individual who follows all rules of the road and drives carefully, but nevertheless somehow causes injury, has ordinarily committed no crime. We do not believe that the legislature intended to make this conduct criminal—and felonious, at that—unless the driver *actually* knew about the pursuit by an officer and was trying to flee.

Mr. Welch suggests that "imposing strict liability is common where the legislature's overriding concern is to protect the public from injury." Reply Br. 2-3. Of course, the inquiry cannot be that simple; nearly *all* criminal statutes are intended to protect the public from injury. We are mindful that "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Staples v. United States*, 511 U.S. 600, 605 (1994) (quotation marks

---

[12] (...continued)
     for any person to do any act forbidden or fail to perform any Act required in this Chapter.

625 ILCS 5/11-202.

and citation omitted, brackets and italics in original). When interpreting federal statutes, the Supreme Court has dispensed with the mens rea requirement in a narrow class of statutes that it has termed "public welfare" statutes. *Id.* at 606. A key consideration in determining whether a statute falls within this class is whether a person would be surprised to learn that the conduct criminalized is not an innocent act. *Id.* at 610; *see also Morissette v. United States*, 342 U.S. 246, 260 (1952) ("In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger." (quotation marks and citation omitted)).

Illinois has gone a step further in taking the guess-work out of the analysis. Its legislature has provided a statute stating that the legislature must make its purpose clear in order to create a strict liability crime punishable by imprisonment.[13]

---

[13] 720 ILCS 5/4-9 provides:

> A person may be guilty of an offense without having, as to each element thereof, one of the mental states described in Sections 4-4 through 4-7 if the offense is a misdemeanor which is not punishable by incarceration or by a fine exceeding $500, or the statute defining the offense clearly indicates a legislative purpose to impose absolute liability for the conduct described.

> Driving under the influence, likened to a strict liability crime in *Begay v. United States*, 553 U.S. 137, 145 (2008), evinces such a clear purpose because of a sub-

(continued...)

Traffic offenses have been held to be prime candidates for strict liability because such offenses:

> [r]esult in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element.

*People v. Teschner*, 394 N.E.2d 893, 894-95 (Ill. App. Ct. 1979) (quoting *Morissette*, 342 U.S. at 256) (brackets in original).

We must acknowledge that traffic offenses generally are considered public welfare offenses, *see id.* at 895, and that the offense at issue here is situated physically in the Illinois Vehicle Code. Nevertheless, these factors

---

[13] (...continued)
section of the statute that specifically precludes a defense that use of the drug in question was lawful. *People v. Teschner*, 394 N.E.2d 893, 895 (Ill. App. Ct. 1979). For the reasons stated in the text, we do not see a clear intent to make aggravated fleeing a strict liability crime.

cannot control whether the offense requires a criminal intent. The statute in question simply does not meet the requirements imposed by the Illinois legislature before the usual requirement of a criminal intent can be considered absent. There is certainly no specific indication by the Illinois legislature that an intent requirement is absent. Indeed, the entire statutory scheme indicates the opposite. First, the non-aggravated form of the same offense requires a criminal intent. It indeed would be unusual for the legislature to require a specific intent to punish the less serious degree of the violation, while making the more serious violation an absolute liability offense.[14]

---

[14] We cannot accept Mr. Welch's argument that *Dean v. United States*, ___ U.S. ___, 129 S. Ct. 1849 (2009), requires a different view. There, the Supreme Court declined to find an implied mens rea requirement in a statute criminalizing discharge of a firearm during a crime of violence. Mr. Welch notes that one consideration relied on by the Court was that the statute also criminalized the brandishing of a firearm during a crime of violence, and "brandish[ing]" was a defined term; the statute required that it be done "in order to intimidate" someone. *Id.* at 1853. Thus, the "brandish" provision had an intent requirement that suggested the absence of an intent requirement from the "discharge" provision to be intentional. *Id.* at 1854. Similarly here, Mr. Welch argues, the offense of unaggravated fleeing contains an intent term—"willfully"—while the aggravated offense does not. Therefore, Mr. Welch contends, the omission of an intent term from the aggravated offense must have been intentional.

(continued...)

[14] (...continued)

We note first that this consideration was just one among many for the Court. In *Dean*, the statute's use of the passive voice also indicated that proof of intent was not required, *id.* at 1853, and the presumption that proof of criminal intent is required was not a factor in the case because, although "[i]t is unusual to impose criminal punishment for the consequences of purely accidental conduct," "it is not unusual to punish individuals for the unintended consequences of their *unlawful* acts," such as committing a robbery with a loaded gun, *id.* at 1855 (emphasis in original). Neither of these considerations are relevant to the Illinois statute.

Additionally, the term "brandish" appeared in subsection (ii) of the *Dean* statute ("if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years"), while "discharge" appeared in subsection (iii) ("if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years"). *Id.* at 1853 (citation omitted). The Court noted that the subsections "explain how defendants are to be sentenced" for the complete offense of using a firearm in relation to a crime of violence or a drug trafficking crime. *Id.* (quotation marks and citation omitted). The Illinois offenses of aggravated and unaggravated fleeing, however, do not have the same conceptual or structural relationship. They define two separate offenses. The unaggravated offense appears in Section 11-204 of the Illinois Vehicle Code and is a class A misdemeanor; the aggravated offense appears in Section 11-204.1 and is a class 4 felony.

Even without assistance from *Dean*, Mr. Welch may contend that the omission of an explicit intent term from the aggravated offense was intentional in light of the unaggravated

(continued...)

Secondly, deeming aggravated fleeing an absolute liability offense would be incongruous with the general scheme that Illinois has crafted to regulate driving a motor vehicle within the state. Notably, the penalty for aggravated fleeing is much more severe than for a typical traffic offense. Even DUI is only a Class A misdemeanor for the first two offenses, punishable by a maximum of one year in prison. 625 ILCS 5/11-501(c)(1), (d)(1)(A), (d)(2)(A), 730 ILCS 5/5-4.5/55. Moreover, and perhaps most importantly, the injury caused by aggravated fleeing is simply not the same without intent: Aggravated fleeing punishes, in part, the defiance of police authority. If the driver is unaware of the officer and not acting with an intent to flee, there is no defiance to punish.

---

[14] (...continued)
offense. However, the unaggravated and the aggravated offense are not structured in the same way. The unaggravated offense punishes one who:

> wilfully fails or refuses to obey such direction [to stop], increases his speed, extinguishes his lights, or otherwise flees or attempts to elude the officer. . . .

625 ILCS 5/11-204.

The most natural reading of this provision is that "willfully" modifies the first three clauses, all of which are forms of "flee[ing] or attempt[ing] to elude the officer." After all, increasing speed and extinguishing lights are easily done unintentionally. Because some drivers are quite inattentive, basic failure to stop is also conceivably done unintentionally. Intent turns these acts into something else: flight.

We recognize that some state statutes refer to "willful fleeing." *See, e.g.*, Cal. Vehicle Code § 2800.1(a) ("Any person who, while operating a motor vehicle and with the intent to evade, willfully flees . . . ."); Idaho Code Ann. § 49-1404(1) ("Any driver of a motor vehicle who wilfully flees or attempts to elude a pursuing police vehicle . . . ."). But given the common meaning of "flee," the presence of other Illinois statutes, and the general presumption against strict liability crimes, we do not see a clear intent on the part of the Illinois legislature to impose strict liability.

Therefore, we conclude that the Illinois statute requires purposeful conduct.[15]

### 3.

Having concluded that the Illinois statute requires purposeful conduct, we now address whether the conduct proscribed by the statute is violent and aggressive as those terms are employed in the Supreme Court's recent interpretations of the ACCA. We begin our inquiry by returning to the language of the statute.

---

[15] In addition to the foregoing, the Government refers us to the Illinois Pattern Jury Instructions, which indicate that aggravated fleeing requires intent. Ill. Pattern Jury Instructions-Crim. 23.03 (2000). These are not the law, however, and are therefore entitled to little weight. *See People v. Peete*, 743 N.E.2d 689, 695 (Ill. App. Ct. 2001) ("Illinois pattern jury instructions are not binding. [They] are used only when they accurately state the law.").

**a.**

The Illinois aggravated fleeing statute criminalizes four distinct varieties of flight. In evaluating whether this *aggravated* fleeing conduct is violent and aggressive, our first task is to determine, if possible, the precise offense with which we are concerned. Our approach to this problem of divisibility was set out, in plenary fashion, in *United States v. Woods*, 576 F.3d 400 (7th Cir. 2009); *see also Shepard v. United States*, 544 U.S. 13, 26 (2005). We must employ a categorical approach; we do not look at the facts of the prior conviction. Rather, we look only at the statutory definition of the crime. *Woods*, 576 F.3d at 403. In examining the elements of the crime, we consider whether, in the ordinary case, they reflect a violent felony. *Id.* at 404. When a statute may be violated in several ways and only some of those ways constitute a violent felony within the meaning of the ACCA, we may consider a limited list of additional materials to ascertain the precise branch of the statute which the defendant violated: "the terms of the charging document, the terms of a plea agreement or transcript of a colloquy between judge and defendant . . . or to some comparable judicial record of this information." *Id.* at 404 (quotation marks and citation omitted). This consultation is limited to determining which branch of the statute the defendant violated; it is not an examination of the defendant's conduct. *Id.* at 405.

The Illinois aggravated fleeing statute makes fleeing from a police officer an aggravated offense if one of four conditions are met. Those conditions are that the fleeing:

(1) is at a rate of speed at least 21 miles per hour over the legal speed limit;

(2) causes bodily injury to any individual;

(3) causes damage in excess of $300 to property; or

(4) involves disobedience of 2 or more official traffic control devices.

625 ILCS 5/11-204.1(a). In light of the principles that we have set forth, this statutory scheme would appear, at least on first reading, to present a difficult problem. The record does not contain the state court papers pertaining to the aggravated vehicular fleeing conviction. It does contain a description of the offense in the PSR, but that description is based on arrest reports. Arrest reports are not authorized sources for divisibility purposes. *Shepard*, 544 U.S. at 16 (holding that a police report cannot be considered to determine whether generic burglary was committed). They cannot be made a permissible source because they are referenced in a PSR. *See United States v. Hays*, 526 F.3d 674, 678 (10th Cir. 2008); *United States v. Corona-Sanchez*, 291 F.3d 1201, 1212 (9th Cir. 2002) (en banc). Therefore, under the circumstances here, we must determine that *all four* branches constitute violent felonies under *Begay* in order to conclude that aggravated fleeing is a violent felony.

When we examine each of the branches, we note at the outset that they fall into two subcategories. Branch one (rate of speed at least 21 miles per hour over the legal speed limit) and branch four (disobedience of two or more traffic signals) describe the manner of the defen-

dant's flight. On the other hand, branch two (causes bodily injury to any individual) and branch three (causes damage in excess of $300 to property) describe the effect of the flight.

If the violent nature of the felony turned solely on these factors, we might have significant difficulty in categorizing the offense of aggravated fleeing as violent and aggressive, as *Begay* and *Chambers* define those terms. Branches one and four are the easier of the two categories to reconcile with *Begay* and *Chambers*, but even these are problematic. Fleeing at a pace well over the speed limit or running through traffic signals reasonably may be characterized as violent and aggressive acts, comparable to brandishing a deadly weapon. They demonstrate, it might be argued, a level of indifference to human safety above and beyond the basic act of fleeing and, in that respect, simply constitute specific, objective examples of action that creates a substantial risk of serious physical injury or death to any person.[16] On the other hand, under Illinois law, exceeding the speed limit by 40 miles per hour is a misdemeanor;[17] reckless driving, which requires "willful or wanton disregard for the safety of persons or property," is a misdemeanor

---

[16] *See United States v. Hudson*, 577 F.3d 883, 885 (8th Cir. 2009) (holding that fleeing statute that prohibited fleeing in a manner that "creates a substantial risk of serious physical injury or death to any person" was a violent felony).

[17] 625 ILCS 5/11-601.5.

as well.[18] Given these features of the Illinois code, it may be difficult to maintain that exceeding the speed limit by twenty miles an hour constitutes aggressive and violent behavior.

Branches two and three speak to the *results* of the flight, not its manner and are an even more problematic basis for characterizing an offense as aggressive and violent. While these results may indeed be the product of aggressive and violent behavior, they can be the results of other behavior as well. These results cannot be considered an easy and identifiable proxy for the sort of conduct that must form the basis of a violent felony for purposes of the ACCA.

We believe, however, that there is another and more appropriate approach to this Illinois statute that is more in harmony with the intent of Congress in the ACCA and with the interpretative decisions of the Supreme Court. The Illinois statute before us, while requiring that the conditions we have just described be met, also requires, for all of these categories, that the defendant intentionally flee a police officer after having been signaled to stop. If this common underlying activity—the very act of intentionally fleeing in defiance of the officer's command—constitutes an aggressive and violent act, the crime is an aggressive and violent one, no matter which of the categories we have discussed is also applicable. Indeed, those categories are, under this analytical approach, simply *limitations* on the operation of the

---

[18] 625 ILCS 5/11-503.

statute that make it applicable only to certain intentional flights from a police officer. However, if all intentional flights against the orders of an officer are aggressive and violent, those limitations are not relevant to our inquiry under the ACCA.

**b.**

We turn then to an analysis of whether all intentional flights against the order of a police officer are aggressive and violent as those terms are employed in an analysis of the ACCA.

This is not the first time that we have examined whether intentional flight in defiance of a police officer's order is an aggressive and violent act. This question was before us in *Spells.* In that case, we held that an Indiana vehicular fleeing statute qualified as a violent felony under the *Begay* framework. The Indiana statute required that the offender "knowingly . . . flee[] from the law enforcement officer after the officer has . . . ordered the person to stop." *Spells*, 537 F.3d at 749 (citation omitted).

Our task therefore is to ascertain whether our decision in *Spells* remains viable after the Supreme Court's decision in *Chambers*. An examination of *Chambers* makes clear that it leaves *Spells* undisturbed. *Chambers* held that the offense of failure to report to confinement is not a violent felony. The other federal courts have extended *Chambers* to cover a "walkaway" escape, where a prisoner

leaves unsecured custody such as a halfway house.[19] Numerous courts have reaffirmed, however, that an escape from secure custody is not analogous to failure to report and, therefore, is not covered by *Chambers*. For instance, the First Circuit held that "escape from secure custody is a stealth crime that is likely to cause an eruption of violence if and when it is detected. Therefore, the 'powder keg' rationale still applies to such a crime." *United States v. Pratt*, 568 F.3d 11, 22 (1st Cir. 2009). The Eighth Circuit has agreed. *United States v. Pearson*, 553 F.3d 1183, 1186 (8th Cir. 2009) ("Accordingly, *Chambers* overrules this circuit's precedent that all escapes—including failures to return or report to custody—are crimes of violence, but leaves intact our precedent

---

[19] *See United States v. Ford*, 560 F.3d 420, 426 (6th Cir. 2009) ("Ford committed a 'walkaway' escape, which no doubt may create a greater risk of physical injury than a failure to report, but which remains different from a jailbreak and other crimes of violence both in kind and in its risk of physical injury to others."); *United States v. Pappan*, No. 07-8020, 2009 WL 489963, at *4 (10th Cir. Feb. 27, 2009) (holding that escape statute is not a violent felony where it can be violated if defendant signed out of corrections facility for purpose of attending work but failed to attend work); *United States v. Lee*, 586 F.3d 859, 874 (11th Cir. 2009) ("In sum, we hold that a non-violent walkaway escape from unsecured custody is not [a violent felony]."); *United States v. Charles*, 667 F. Supp. 2d 1246, 1258-59 (D. Kan. 2009) (treating walkaway escape as escape from non-secure custody, and finding it not to be a crime of violence).

holding that escape from custody is a crime of violence.").[20]
We also employed this rationale in *Dismuke* when we
stated: "*Chambers* implies that unlike a failure to report,
which does not have these characteristics [aggressive
conduct with potential for violence], an escape from
physical custody would [qualify as a violent felony]."
*Dismuke*, 593 F.3d at 595; *see also Sykes*, 2010 WL 843861,
at \*3 (stating that *Spells*'s "reasoning has been im-
plicitly affirmed in *Chambers*").

The conclusion that *Chambers* did not disturb our
holding in *Spells* is supported by the language of
*Chambers*, which explicitly distinguished failure to
report from escape from confinement. *Chambers*, 129 S. Ct.
at 691. Vehicular fleeing, the offense at issue here, is much
more similar to the latter. While failure to report is a
passive crime characterized by inaction, *id.* at 692, vehicu-
lar fleeing necessarily involves affirmative action on the
part of the perpetrator. As the Court pointed out, one

---

[20] Also, since *Chambers*, the Fifth and Sixth Circuits have held
that fleeing by vehicle is a violent felony. *United States v.
Harrimon*, 568 F.3d 531, 534-35 (5th Cir. 2009); *United States v.
Young*, 580 F.3d 373, 377-78 (6th Cir. 2009). The Tenth Circuit
has reaffirmed an earlier decision to the same effect. *United
States v. Wise*, ___ F.3d ___, No. 08-4033, 2010 WL 775556, at \*5-\*6
(10th Cir. Mar. 9, 2010). The Eleventh Circuit, after *Chambers*,
has found aggravated fleeing to be a violent felony. *United
States v. Harris*, 586 F.3d 1283, 1288-89 (11th Cir. 2009). *But
see United States v. Harrison*, 558 F.3d 1280, 1296-98 (11th Cir.
2009) (relying in part on *Chambers* to hold that unaggravated
vehicular fleeing offense is not a violent felony).

who fails to report is not drawing attention to himself. *Id.* Similarly, a walkaway can occur without being detected until later. If an offender fails to report or leaves while beyond the presence of security, there is no immediate pursuit or other attempt to apprehend and none of the risks attendant with an immediate pursuit. By contrast, one who flees a police officer in a vehicle draws attention to himself, challenges the immediate authority of the police officer and calls on the officer to give immediate chase. Whether the officer accepts that invitation, the perpetrator takes action to elude capture with his vehicle, action that, by its very nature, endangers others. Indeed, Mr. Welch has emphasized that he does not contest the risk of physical harm posed by vehicular fleeing. Reply Br. 2 ("Welch has not argued that aggravated fleeing does not present a serious potential risk of injury to others.").

*Spells* must be read, moreover, in light of our decision in *Dismuke*. There, instead of simply relying on *Spells*, we considered anew the application of *Begay* to vehicular fleeing statutes. We specifically held "that the 'violent and aggressive' limitation requires only that a residual-clause predicate crime be characterized by aggressive conduct with a similar potential for violence and therefore injury as the enumerated offenses." *Dismuke*, 593 F.3d at 594. We understood *Chambers* as supporting this holding. *Id.* at 595. We noted as well that, in *Howze,* we had held that vehicular fleeing categorically posed a serious risk of physical injury. Indeed, we reaffirmed that vehicular fleeing presents a serious risk of physical injury to another. *Id.* at 591 n.3. *Spells*'s holding that vehicular fleeing is aggres-

sive conduct is not only undisturbed but reaffirmed by *Dismuke*. The same must be said of its holding that:

> An individual's purposeful decision to flee an officer in a vehicle when told to stop, reflects that if that same individual were in possession of a firearm and asked to stop by police, [he] would have a greater propensity to use that firearm in an effort to evade arrest.

*Spells*, 537 F.3d at 752.

*Spells*, *Dismuke* and *Sykes* make clear that we stand with the majority of circuits that have held that intentional vehicular fleeing is a violent felony within the meaning of the ACCA.[21] Accordingly, we hold that the district court correctly considered the defendant's conviction for aggravated vehicular fleeing a violent felony for purposes of the ACCA.

## C.

Mr. Welch submits that he received ineffective assistance of counsel, at sentencing and on appeal, when counsel failed to argue that, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Mr. Welch's prior nonjury juvenile adjudication could not be used to enhance his sentence

---

[21] *See Wise*, 2010 WL 775556, at *6; *Young*, 580 F.3d at 377-78; *Harrimon*, 568 F.3d at 534-35; *United States v. West*, 550 F.3d 952, 971 (10th Cir. 2008). *But see United States v. Tyler*, 580 F.3d 722, 726 (8th Cir. 2009); *Harrison*, 558 F.3d at 1295.

beyond the statutory maximum. To succeed on this claim, Mr. Welch must demonstrate that (1) counsel's performance was below an objective standard of reasonableness, and (2) but for the deficiency, there is a reasonable probability that the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Because Mr. Welch must satisfy both prongs in order to prevail, we need not reach the deficiency inquiry because Mr. Welch has failed to establish prejudice.

Initially, the Government argues that Mr. Welch suffered no prejudice from his counsel's failure to raise the issue at sentencing because Mr. Welch raised the issue pro se. As a result, "[t]he district court carefully considered the claim but ultimately rejected it." Government's Br. 22. We cannot accept this argument. In his written objections, Mr. Welch preserved the issue of whether *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), was correctly decided. Additionally, he asked the court to "please consider that at the age of 16 I was young and remiss[]." R.18 at 4. At the sentencing hearing, the court understood Mr. Welch to be arguing that it had discretion to decline to consider the juvenile offense and that the offense did not meet the *statutory* definition of violent felony; Mr. Welch confirmed this. There was no specific *Apprendi* argument with respect to the juvenile offense. We cannot say, therefore, that the district court confronted squarely the issue that Mr. Welch now raises.

In order to show *Strickland* prejudice, Mr. Welch must show a reasonable probability that his underlying ar-

gument would have been accepted at the sentencing hearing. Strictly speaking, this standard does not require that we actually decide the merits of the underlying issue. However, in the context of this specific issue, considerations of judicial economy counsel that we address the underlying issue and decide it.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Mr. Welch contends that his prior juvenile adjudication, which was not obtained by a jury, is not a "prior conviction" for *Apprendi* purposes.[22]

The majority of circuits that have examined the question of whether the absence of a jury trial prevents the use of a juvenile adjudication to enhance a sentence under the ACCA have concluded that there is no such barrier.[23] After studying the opinions of the circuits that have addressed the matter, we join the majority.

When the Supreme Court carved out of its holding in *Apprendi* an exception allowing for the use of prior con-

---

[22] Mr. Welch pleaded guilty to his federal offense of conviction. Because his juvenile adjudication was not charged in the indictment, however, it may not be used to enhance his sentence if it is subject to the *Apprendi* rule. *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000).

[23] The ACCA explicitly permits the use of otherwise qualifying juvenile convictions to enhance sentences.

victions, the Court believed that the procedural safe-
guards surrounding such a conviction gave it sufficient
reliability that further protections were not required.
Specifically, the Court relied upon the "certainty that
procedural safeguards attached to any 'fact' of prior
conviction . . . mitigated the due process and Sixth Amend-
ment concerns otherwise implicated in allowing a judge
to determine a 'fact' increasing punishment beyond the
maximum statutory range." *Id.* at 488. The Court further
said that:

> there is a vast difference between accepting the
> validity of a prior judgment of conviction entered
> in a proceeding in which the defendant had the
> right to a jury trial and the right to require the
> prosecutor to prove guilt beyond a reasonable
> doubt, and allowing the judge to find the required
> fact under a lesser standard of proof.

*Id.* at 496.

Our colleagues in the Ninth Circuit were the first to
address whether the Supreme Court's discussion in
*Apprendi* barred the use of any juvenile adjudication to
enhance a sentence under the ACCA. *See United States v.
Tighe*, 266 F.3d 1187 (9th Cir. 2001). A majority of the panel
took the view that the Supreme Court intended to bar
the use of such juvenile adjudications. In reaching its
conclusion, the Ninth Circuit found particularly con-
vincing a passage in the Supreme Court's opinion in
*Jones v. United States*, 526 U.S. 227 (1999):

> "One basis for that constitutional distinctiveness [of
> prior convictions] is not hard to see: unlike virtually

any other consideration used to enlarge the possible
penalty for an offense . . . *a prior conviction must itself
have been established through procedures satisfying the
fair notice, reasonable doubt and jury trial guarantees.*"

*Tighe*, 266 F.3d at 1193 (quoting *Jones*, 526 U.S. at 249)
(brackets and emphasis in *Tighe*). The Ninth Circuit
concluded that the use of prior convictions to enhance a
sentence "was rooted in the concept that prior convic-
tions have been, by their very nature, subject to the funda-
mental triumvirate of procedural protections intended
to guarantee the reliability of criminal convictions: fair
notice, reasonable doubt and the right to a jury trial." *Id.*

The Ninth Circuit also found guidance in the passage
from *Apprendi* that we have previously quoted:

"There is a vast difference between accepting the
validity of a prior judgment of conviction entered in a
proceeding in which the defendant had the right to a
jury trial and the right to require the prosecutor to
prove guilt beyond a reasonable doubt, and allowing
the judge to find the required fact under a lesser
standard of proof."

*Id.* at 1194 (quoting *Apprendi*, 530 U.S. at 496).

Thus, the court concluded that "*Apprendi*'s . . . 'prior
conviction' exception is limited to prior convictions
resulting from proceedings that afforded the procedural
necessities of a jury trial and proof beyond a reasonable
doubt." *Id.* Recognizing that juvenile adjudications
did not typically result from a jury trial, they were ex-
cluded.

The dissenting judge in *Tighe* took another view. For the dissent, the language from *Jones* meant only that "Congress has the constitutional power to treat prior convictions as sentencing factors subject to a lesser standard of proof because the defendant presumably received all the process that was due when he was convicted of the predicate crime." *United States v. Tighe*, 266 F.3d 1187, 1200 (9th Cir. 2001) (Brunetti, J., dissenting). The dissent reasoned that "where a juvenile received all the process constitutionally due at the delinquency proceeding stage," the resulting adjudication could be used to justify an enhancement because "[t]o hold otherwise would have required the court 'to hold that the enhancement of an adult criminal sentence requires a higher level of due process protection than the imposition of a juvenile sentence.'" *Id.* at 1198-99 (citation omitted).

With the benefit of the dialogue initiated by the thoughtful writings in *Tighe*, our colleagues in many other circuits have had subsequent opportunities to analyze this issue. As we have noted previously, they have found the dissenting position in *Tighe* to be more convincing and, along the way, have refined the rationale supporting that position. For instance, the Court of Appeals for the Eighth Circuit expressed doubt that the Supreme Court in *Apprendi* intended to establish a rigid prerequisite for the definition of the sort of judgment of conviction that would qualify for the exception to its holding. The Eighth Circuit noted that "while the Court established what constitutes sufficient procedural safeguards (a right to jury trial and proof beyond a rea-

sonable doubt), and what does not (judge-made findings under a lesser standard of proof), the Court did not take a position on possibilities that lie in between these two poles." *United States v. Smalley*, 294 F.3d 1030, 1032 (8th Cir. 2002). The Eighth Circuit did not interpret the *Jones* passage as establishing a rigid definition of "prior conviction." *Id.* Rather, the Eighth Circuit believed that the proper inquiry was the overall reliability of a conviction—"whether juvenile adjudications, like adult convictions, are so reliable that due process of law is not offended by such an exemption." *Id.* at 1033. The court concluded that juvenile adjudications qualified for an exemption from the *Apprendi* rule because defendants in those proceedings have the right to notice, the right to counsel, the right to confront witnesses, the right to proof beyond a reasonable doubt and the privilege against self-incrimination. *Id.* In its view, the use of a jury "would 'not strengthen greatly, if at all, the fact-finding function.' " *Id.* (quoting *McKeiver v. Pennsylvania*, 403 U.S. 528, 547 (1971) (plurality opinion)).

In the wake of *Smalley*, several other circuits have followed the same theme.[24] The Fourth Circuit, for instance, refused to say that the fact-finding process in

---

[24] State courts have followed *United States v. Smalley*, 294 F.3d 1030 (8th Cir. 2002), as well. *See State v. Weber*, 149 P.3d 646, 653 (Wash. 2006); *State v. McFee*, 721 N.W.2d 607, 619 (Minn. 2006); *Ryle v. State*, 842 N.E.2d 320, 323 (Ind. 2005); *State v. Hitt*, 42 P.3d 732, 740 (Kan. 2002). *But see State v. Harris*, 118 P.3d 236, 246 (Or. 2005); *State v. Brown*, 879 So.2d 1276, 1290 (La. 2004).

a judge-imposed juvenile adjudication was so suspect that it could not be considered reliable when employed to enhance a later criminal sentence. *See United States v. Wright*, 594 F.3d 259, 264 (4th Cir. 2010). If a judge-imposed juvenile adjudication is considered to be a constitutionally sufficient basis for depriving a juvenile of his liberty for a significant period of time, reasoned the court, there is no need to consider that adjudication "off limits for sentencing consideration if the same juvenile later violates § 924(e)'s armed career criminal prohibition." *Id.* "As a jury is not required in a juvenile adjudication on the merits, we see no reason to impose such a requirement through the back door by allowing former juveniles who have subsequently reached adulthood to overturn their adjudications in subsequent sentencing hearings." *Id.* at 263-64; *see also United States v. Crowell*, 493 F.3d 744, 750 (6th Cir. 2007) ("Juvenile adjudications, where the defendant has the right to notice, the right to counsel, the privilege against self-incrimination, the right to confront and cross-examine witnesses, and the right to a finding of guilt beyond a reasonable doubt, provide sufficient procedural safeguards to satisfy the reliability requirement that is at the heart of *Apprendi*."). This same rationale found acceptance in the Third and Eleventh Circuits. *See United States v. Jones*, 332 F.3d 688, 696 (3d Cir. 2003) ("It follows that if Lester Jones was afforded all the procedural safeguards that he is constitutionally due, the District Court properly enhanced his sentence pursuant to the ACCA."); *United States v. Burge*, 407 F.3d 1183, 1190 (11th Cir. 2005) ("We base our holding

on the reasoning of our sister circuits in *Smalley* and *Jones*.").[25]

We agree with these circuits that a prior juvenile adjudication is a "prior conviction" under *Apprendi.* We do not believe *Apprendi* or *Jones* signals the Supreme Court's distrust of the factual integrity of juvenile adjudications that conform to the constitutional requirements for such proceedings. *See McKeiver*, 403 U.S. at 528; *In re Winship*, 397 U.S. 358 (1970); *In re Gault*, 387 U.S. 1 (1967). In this respect, we note that the Court in *Apprendi* stated:

> If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached.

530 U.S. at 484. We believe that this passage is best read as requiring that a defendant must receive all the protections to which he is entitled. Prior convictions are not subject to the *Apprendi* rule if the defendant received all the protections to which he was constitu-

---

[25] The First Circuit also has permitted the use of juvenile adjudications to enhance a sentence, but that case does not inform our inquiry because it confronted a situation where state law provided juveniles with the right to a jury trial. *United States v. Matthews*, 498 F.3d 25, 35 (1st Cir. 2007).

tionally entitled, and the integrity of the fact-finding procedures are thereby ensured. There can be no doubt that the Supreme Court's jurisprudence has been vigilant with respect to the fact-finding processes of juvenile proceedings. "The same considerations that demand extreme caution in factfinding to protect the innocent adult apply as well to the innocent child." *Winship*, 397 U.S. at 365. Nevertheless, although emphasizing that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution," *Gault*, 387 U.S. at 36, the Supreme Court clearly has held that juvenile adjudications meet constitutional standards even when they do not include a jury trial, *McKeiver*, 403 U.S. at 545-47. We agree with other circuits that the protections juvenile defendants receive—notice, counsel, confrontation and proof beyond a reasonable doubt—ensure that the proceedings are reliable.

Therefore, because juvenile adjudications are reliable, they are not subject to the *Apprendi* rule. Because Mr. Welch's juvenile conviction was admissible to enhance his sentence under the ACCA, he was not prejudiced by the failure of his attorney to argue the contrary. Accordingly, his ineffective assistance of counsel claim must fail.

## Conclusion

Mr. Welch's prior conviction for the Illinois offense of aggravated fleeing or attempting to elude a police

officer was properly treated as a "violent felony" under the ACCA, as was his prior juvenile adjudication. His sentence therefore was imposed in accordance with governing legal principles, and the judgment is accordingly affirmed.

AFFIRMED

POSNER, *Circuit Judge*, dissenting. The defendant pleaded guilty to a charge of illegal possession of a gun by a felon, in violation of 18 U.S.C. § 922(g)(1), for which the maximum prison sentence ordinarily would have been 120 months. 18 U.S.C. § 924(a)(2). But the judge, because he found that the defendant had prior convictions for three "violent felonies," was required by the Armed Career Criminal Act to impose a sentence of at least 15 years, 18 U.S.C. § 924(e)(1), and did so. We affirmed in an unpublished order. *United States v. Welch*, No. 06-3385 (7th Cir. Feb. 21, 2007). The following year the defendant moved to vacate his sentence under 28 U.S.C. § 2255. One ground of his motion was that his lawyer had rendered ineffective assistance to him in failing to challenge the use of two of the "violent felony" convictions—a juvenile conviction and a conviction for "aggravated fleeing"—to increase his sentence.

There is no doubt that the lawyer was ineffective in failing on appeal to challenge the use of the juvenile conviction. That was a substantial issue, which had never been resolved by this court, while the only other issue he raised on appeal related to drug testing in the period of supervised release that will follow the defendant's release from prison, an issue of little consequence in view of the length of his sentence. My colleagues have elided the issue of ineffective assistance by addressing the merits of the challenge to the use of the juvenile conviction and holding that the challenge fails, so that the defendant wasn't harmed by the lawyer's inadequacy. And the government concedes that the status of aggravated fleeing under the Armed Career Criminal Act is independently reviewable under 28 U.S.C. § 2255(f)(3) in light of the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), because, as a result of that decision, there is "a significant risk that [the] defendant . . . faces a punishment that the law cannot impose upon him." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004).

I don't think that either the juvenile conviction or the conviction for aggravated fleeing was a conviction of a "violent felony" within the meaning of the Armed Career Criminal Act.

At age 16 the defendant was adjudged in an Illinois juvenile court to have attempted an armed robbery. He had no right to trial by jury. 705 ILCS 405/5-101(3); *People v. Taylor*, 850 N.E.2d 134, 140 (Ill. 2006). The Supreme Court had ruled in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "other than the fact of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," unless the defendant waived these rights. See also *Shepard v. United States*, 544 U.S. 13, 24-26 (2005); *United States v. Browning*, 436 F.3d 780 (7th Cir. 2006). An initial question is whether the judgment in the defendant's juvenile-court proceeding was a "prior conviction" for *Apprendi* purposes. Technically it was not a "conviction" at all, because in Illinois as in other states a juvenile-court proceeding, though it often results in a period of confinement (imprisonment by another name), is not deemed a criminal proceeding. *People v. Taylor*, *supra*, 850 N.E.2d at 141. And "because delinquency proceedings are not criminal proceedings, not all criminal safeguards have been employed in the juvenile proceeding. For example, a minor has no right to a jury trial, in part, because a jury trial would invest a juvenile proceeding with the appearance and form of a criminal trial." *In re R.G.*, 669 N.E.2d 1225, 1227 (Ill. App. 1996). Obviously, though, such a proceeding is more akin to a criminal proceeding than to a conventional civil proceeding when the minor's liberty is at stake. See *id*. at 1227-28; see also *State v. Bloomer*, 909 N.E.2d 1254, 1266 (Ohio 2009). It is best described as "quasi-criminal," as in *In re B.L.D.*, 113 S.W.3d 340, 351 (Tex. 2003).

The Supreme Court has held that no jury is required in a juvenile case, even though the outcome of such a case may well be imprisonment. *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971). The Court noted the "idealistic" hope that the rehabilitation of juvenile offenders would be assisted by avoiding the criminal label and the crim-

inal courts, and while recognizing the failure of the move-ment to live up to its ideals, the Court decided not to terminate the experiment by requiring that all ele-ments of criminal procedure be followed in juvenile proceedings. *Id.* at 545-51 (plurality opinion).

But whether a juvenile can be imprisoned on the basis of findings made by a juvenile-court judge rather than by a jury is different from whether a "conviction" so procured (if it should even be called a "conviction") is the kind of "prior conviction" to which the Court referred in *Apprendi*, namely a conviction that can be used to jack up a person's sentence beyond what would otherwise be the statutory maximum. The government doesn't even argue that it should be usable for this purpose; its entire argument is that because all but one of the cir-cuits to have opined on the issue deem a juvenile-court "conviction" a "prior conviction" within the meaning of *Apprendi*—compare *United States v. Crowell*, 493 F.3d 744, 749-51 (6th Cir. 2007); *United States v. Burge*, 407 F.3d 1183, 1187-91 (11th Cir. 2005); *United States v. Jones*, 332 F.3d 688, 696 (3d Cir. 2003); and *United States v. Smalley*, 294 F.3d 1030, 1031-33 (8th Cir. 2002); see also *United States v. Matthews*, 498 F.3d 25, 32-36 (1st Cir. 2007), with *United States v. Tighe*, 266 F.3d 1187, 1191-95 (9th Cir. 2001)—the failure of the defendant's lawyer to raise the issue didn't hurt the defendant be-cause we would be unlikely to reject the majority posi-tion. That is a feeble argument, since our court does not mechanically decide a case on the basis of the circuit score-card, without independent consideration of the issues.

The sentence I quoted from *Apprendi* implies that a prior conviction used to increase the length of the sentence must be the outcome of a proceeding in which the defendant had a right to have a jury determine his guilt. Otherwise why does the Supreme Court require that any fact, as distinct from a conviction, used to enhance a sentence be a fact found by a jury (unless of course the defendant waived a jury)? Why didn't the Court just say that the fact must be found by a reliable means? Why in *Jones v. United States*, 526 U.S. 227, 249 (1999), decided the year before *Apprendi*, had the Court said that "one basis for that constitutional distinctiveness [of prior convictions] is [that] unlike virtually any other consideration used to enlarge the possible penalty for an offense . . . a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt *and jury trial* guarantees" (emphasis added)?

The Court in *Apprendi* did not take this back when it said that "if a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections *that have, until that point, unquestionably attached*." 530 U.S. at 484 (emphasis added). The defendant in this case was not "deprived of protections" that had attached to his juvenile-court proceeding. But that is not enough. The Court in *Apprendi*, unwilling to overrule

*Almendarez-Torres v. United States,* 523 U.S. 224 (1998), which permitted recidivist enhancements without requiring a trial in the new case to determine the defendant's guilt of an offense used to enhance his sentence, created a narrow exception to the requirement that facts that increase the statutory maximum sentence must be determined by a jury. The exception requires that the defendant's conviction of the prior offense have been established by a process in which he had had a right to a jury. The defendant in this case didn't have that right.

The constitutional protections to which juveniles have been held to be entitled have been designed with a different set of objectives in mind than just recidivist enhancement. So the mere fact that a juvenile had all the process he was entitled to doesn't make his juvenile conviction equivalent, for purposes of recidivist enhancements, to adult convictions.

Suppose a military commission convicted a suspected terrorist of a military crime, in a proceeding in which the defendant had not been entitled to all the rights he would have been entitled to in a conventional criminal proceeding, such as the right to a jury. Would it follow that because he had received all the rights to which military law entitled him, his conviction could be used to enhance a later conviction of a conventional crime? To answer in the affirmative would stretch *Apprendi* awfully far.

The Supreme Court's opinion in *McKeiver* had acknowledged that the juvenile courts are a mess, and subsequent

research confirms that their noncriminal "convictions" may well lack the reliability of real convictions in criminal courts. Steven A. Drizin & Greg Luloff, "Are Juvenile Courts a Breeding Ground for Wrongful Convictions?" 34 *N. Ky. L. Rev.* 257 (2007); Barry C. Feld, "The Constitutional Tension Between *Apprendi* and *McKeiver*: Sentence Enhancements Based on Delinquency Convictions and the Quality of Justice in Juvenile Courts," 38 *Wake Forest L. Rev.* 1111, 1161-77 (2003); Martin Guggenheim & Randy Hertz, "Reflections on Judges, Juries, and Justice: Ensuring the Fairness of Juvenile Delinquency Trials," 33 *Wake Forest L. Rev.* 553, 564-82 (1998); Bluhm Legal Clinic, "Why Youth Contributes to Wrongful Convictions," http://cwcy.org/WhyYouthContributes.aspx (visited Apr. 8, 2010). We learn from this literature that lawyers in juvenile courts are overloaded with cases, that they often fail to meet with their clients before entering a guilty plea and often rely on parents and on the child defendant himself to contact witnesses, and that they rarely file pretrial motions. And because the philosophy on which the juvenile court system was founded emphasizes protecting the "best interests of the child" and rehabilitating rather than punishing the child, the culture of the juvenile courts discourages zealous adversarial advocacy even though in its current form the juvenile justice system is much more punitive than its founders envisaged. Lawyers also appear to be reluctant to appeal juvenile cases and to seek postconviction relief; heavy caseloads, a prevalent view that appeals undermine the rehabilitation process, and an absence of awareness

among juveniles of their appeal rights are the likely reasons for this reluctance.

Of particular relevance to *Apprendi*, the literature finds that judges are more likely to convict in juvenile cases than juries are. They are exposed to inadmissible evidence; they hear the same stories from defendants over and over again, leading them to treat defendants' testimony with skepticism; they become chummy with the police and apply a lower standard of scrutiny to the testimony of officers whom they have come to trust; and they make their decisions alone rather than as a group and so their decisions lack the benefits of group deliberation. It would be hasty to conclude that juvenile-court judges are more prone to convict the innocent than juries are. But if it is true that juvenile defendants fare worse before judges than they would before juries—if there is reason to think that trial by jury would alter the outcomes in a nontrivial proportion of juvenile cases—one cannot fob off the *Apprendi* argument with the observation that a jury makes no difference.

Only the Supreme Court can decide authoritatively what its decisions mean. But the government's inability to give a reasoned basis for that position is telling, and the better view, I believe, is that a juvenile court "conviction" is not usable for enhancing a federal sentence.

As for the defendant's second supposed "violent felony"— "aggravated fleeing"—the other circuits are split over its proper classification. Compare *United States v. Wise*, 597 F.3d 1141, 1148 (10th Cir. 2010); *United*

*States v. LaCasse*, 567 F.3d 763, 765-67 (6th Cir. 2009); *United States v. Harrimon*, 568 F.3d 531, 534-37 (5th Cir. 2009); see also *United States v. Hudson*, 577 F.3d 883 (8th Cir. 2009), holding that it is a violent felony, with *United States v. Harrison*, 558 F.3d 1280, 1290-96 (11th Cir. 2009), and *United States v. Tyler*, 580 F.3d 722, 724-26 (8th Cir. 2009), holding that it is not; see also *United States v. Rivers*, 595 F.3d 558, 564-65 (4th Cir. 2010). (*Tyler*, which did not cite *Hudson*, created a split within the Eighth Circuit.) *Wise*, *Hudson*, and *Tyler* are applications of section 4B1.2 of the federal sentencing guidelines rather than of the Armed Career Criminal Act, but "crime of violence" in the guidelines section is interpreted identically to "violent felony" in the Act. *United States v. Templeton*, 543 F.3d 378, 380 (7th Cir. 2008).

Our court has lined up with the courts that deem "aggravated fleeing" a "violent felony" within the meaning of the Armed Career Criminal Act. *United States v. Sykes*, 598 F.3d 334, 335 (7th Cir. 2010); *United States v. Dismuke*, 593 F.3d 582, 590-96 (7th Cir. 2010); *United States v. Spells*, 537 F.3d 743, 747-53 (7th Cir. 2008). These decisions are questionable in light of *Chambers v. United States*, 129 S. Ct. 687 (2009), where the Supreme Court held that the form of "escape" that consists merely of failing to report to prison on schedule to begin serving one's sentence is not a "violent felony." Neither is a walkaway escape. See, e.g., *United States v. Hart*, 578 F.3d 674, 680-81 (7th Cir. 2009); *United States v. Templeton*, *supra*, 543 F.3d at 383; *United States v. Lee*, 586 F.3d 859, 868-74 (11th Cir. 2009); *United States v. Hopkins*, 577 F.3d 507, 512-

15 (3d Cir. 2009); *United States v. Charles*, 576 F.3d 1060, 1066-69 (10th Cir. 2009).

Typically the walkaway escapee begins his flight on foot but soon switches to a vehicle, while in aggravated fleeing a person disregards a signal or command from a police officer in a police car to pull over. Sometimes he flees at a dangerously high speed, but the offense in Illinois requires only that in the course of flight he disobey at least two "official traffic control devices." 625 ILCS 5/11-204.1(a)(4). That includes not only red lights and stop signs but also such less imperative traffic control devices as signs that say "slow down," "yield right of way," and "no right turn on red light between 7 a.m. and 7 p.m."

Aggravated fleeing is more dangerous on average than walkaway escapes or failures to report, but we know from *Begay v. United States*, *supra*, that dangerousness is not enough to render a crime a "violent felony." *Begay* involved driving under the influence of alcohol or drugs, and the Court held that such conduct is not a violent felony even though it is dangerous. Is aggravated fleeing more dangerous? When it takes the form of running a couple of stop signs, perhaps late at night when there is no other traffic on the road, it may well be less dangerous than the average DUI case. Who knows? But in any event, *Begay* requires that the offense not only create a danger comparable to the dangers created by the offenses enumerated in the Armed Career Criminal Act (arson, burglary, extortion, and use of explosives to commit a crime) but also further

resemble them in involving "purposeful, violent, and aggressive" conduct.

The test is difficult to apply. It is unclear what "aggressive" adds to "violent" (the Court didn't say), except in a case of defensive use of force, which ordinarily is not criminal at all, although it can be, as in a case in which a person is unreasonable in believing (though it is an honest belief) that he must use deadly force to defend himself. It is not even clear what "purposeful" adds to the definition of "violent felony" since even strict-liability crimes are "purposeful" in the sense that a deliberate act is involved. Sex with an underage girl is a crime even if the perpetrator thinks her of age, but the sexual act itself is deliberate.

Thus I don't agree that just because the defendant intended to flee from the police his action was "purposeful" within the meaning of the Supreme Court's formula. Given that the purpose of the catch-all provision in the Armed Career Criminal Act is to enable courts to identify crimes that are similar to the enumerated ones, "purposeful" should be interpreted to mean trying to harm a person's person or property, which is characteristic of the enumerated crimes. Burglary requires proof of intent to commit a crime following unlawful entry, arson proof of intent to destroy property without legal authority, extortion proof of intent to obtain another person's property by a threat. These crimes do not merely create a *risk* of harm, as aggravated fleeing does.

It's not that the enumerated crimes necessarily are motivated by a desire to hurt anyone. The criminal may

simply want the victim's property. (In an arson case, the victim is often an insurance company—and arsonists don't *dislike* insurance companies—rather the contrary!) But to get what he wants he has to harm the victim; purpose to harm is intrinsic to the crime although it often is not the motive. That is not true in a flight case any more than it is true in a DUI case. In both the perpetrator is behaving in a dangerous manner but in neither is he trying to take anything from anyone or otherwise harm anyone. And "although the [fleeing] statute does require intent, the required mental state is only intent to be free of custody, not intent to injure or threaten anyone. It is easy to violate [such a statute] without intending or accomplishing the destruction of property or acting in an aggressive, violence-provoking manner that could jeopardize guards or bystanders." *United States v. Templeton*, *supra*, 543 F.3d at 383.

*Dismuke* calls aggravated fleeing "aggressive" because it involves defiance of authority. 593 F.3d at 595. But that is true of all escapes—the point of *Chambers* was that we can't treat all escapes alike. *Dismuke* calls fleeing "active" rather than "passive," *id*., but all actions are active, yet most are not aggressive. To fail to report to prison when ordered is to defy the authority of the sentencing judge and the Bureau of Prisons. Many acts of civil disobedience are emphatically active and defiant of authority at their core, but are miles away from being aggressive. *Dismuke* notes the possibility of a future confrontation with authority but that is also a likely consequence of a walk-away escape or a failure to report and is an especially likely consequence of many acts of civil disobedience.

Adopting a rule that would exclude from the category of "violent felony" a crime that while it may be dangerous does not involve any intention of harming anyone would go some distance toward clarifying the meaning of "violent felony" and by doing so perhaps check the avalanche of litigation over that meaning.

Echoing *Dismuke*, the majority opinion in the present case tries to distinguish fleeing from an officer from a walkaway escape or failure to report by describing each of the latter offenses as a "passive crime characterized by inaction," which might not be detected or provoke an immediate pursuit, in contrast to "vehicular fleeing [which] necessarily involves affirmative action on the part of the perpetrator" and "challenges the immediate authority of the police officer and calls on the officer to give immediate chase." But both a walkaway escape and a failure to report are challenges to authority; and while the failure to report does involve "inaction" rather than (affirmative) action, a walkaway escape does not. I don't understand what "immediate authority" means and I disagree that the fleer "call[s] on the officer to give immediate chase"; he would much prefer that the officer not give chase and doubtless in some cases the officer does not.

Only the Supreme Court can resolve the issues presented in this appeal. But pending the Court's intervention I am persuaded that the defendant's sentence is illegal.